*Please scan front + back of All. Some are double-sided * Thanks F.M.A. 3/18/22

**PC SCAN**



UNITED STATES DISTRICT COURT
__Northern__ DISTRICT OF ILLINOIS
__Eastern__ DIVISION
ELECTRONIC FILING COVER SHEET

**RECEIVED**
JK
5/19/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Please complete this form and include it when submitting any type of document, letter, or pleading, to the U.S. District Court for __N.D.__ District of Illinois for review and filing.

__Firas Ayoubi__                    R-66956
Name                                ID Number

Please answer questions as thoroughly as possible and circle yes or no where indicated.

1. Is this a new civil rights complaint or habeas corpus petition?      Yes or **No**

   If this is a habeas case, please circle the related statute:   28 U.S.C. 2241 or 28 U.S.C. 2254

2. Is this an Amended Complaint or an Amended Habeas Petition?       Yes or **No**

   If yes, please list case number: _____

   If yes, but you do not know the case number, mark here: _____

3. Should this document be filed in a pending case?                 **Yes** or No

   If yes, please list case number:   ~~1-22-CV-06033~~ 20-CV-7288

   If yes, but you do not know the case number, mark here: _____

4. Please list the total number of pages being transmitted:         _____

5. If multiple documents, please identify each document and the number of pages for each document. For example: Motion to Proceed In Forma Pauperis, 6 pages; Complaint, 28 pages.

| Name of Document | Number of Pages |
|---|---|
| Plaintiffs Objections And Request For Order + Attach Exhibits A-G | 71 Pgs total |

Please note that discovery requests and responses are NOT to be filed; instead they should be forwarded to the attorney(s) of record. Discovery materials sent to the Court will be returned unfiled.

State of Illinois)
County of Lee  )SS:

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
                              )
                              )  Cause: 20-C-7288
In The Matter Of,            )
                              )
FIRAS M. AYOUBI              )  Hon. EXECUTIVE COMMITTEE
                              )
```

## FIRAS AYOUBI'S OBJECTIONS AND REQUEST FOR ORDER

NOW COMES FIRAS AYOUBI, and hereby submits his objections
to the adverse effects the executive committee restrictive filer
order is having on his ability to seek redress in FIRAS AYOUBI
VS. U.S.BANK N.A. ET AL  1:21-CV-06055. He respectfully requests
the issuance of the appropriate orders.

1: In AYOUBI V UNITED STATES OF AMERICA, 20-C-5665 Judge Virginia
Kendall terminated the case as a sanction because she claimed that
plaintiff frivilously asserted imminent danger under the PLRA.
She found that plaintiff also had unpaid fees owed in other cases
and appeals which totaled $3,920.82. Thus, she referred the matter
to the executive committee.

2: The Executive committee, after issuing a citation to the plaintiff
to respond. Issued an order (Doc #16), enjoining plaintiff from
filing anything in the Northern District without first obtaining
leave from the executive committee.

<u>In the matter of Firas Ayoubi 20-C-7288</u>

3: Importantly, the Order specified that "[A]ny new complaints filed by Mr. Ayoubi and transferred to this Court from another jurisdiction will be reviewed by the Executive Committee to determine whether they should be filed" (Doc 16) (Exh A)

4: It also specified "Cases in existence prior to the entry of this order are not affected by this directive and shall proceed as usual", id. (Exh A)

5: In Ayoubi v U.S.Bank et al. Plaintiff initially filed it in the Circuit Court of Cook County Illinois, Law Division in late 2019. Defendants U.S.Bank N.A., PNC Bank, Verizon Wireless, Wal-mart, and American Family Insurance Co. filed motions to dismiss. On Sept 20, 2021 Judge Brendan O'Brien (2175) found that plaintiff did state claims for counts 1,3, 4,5,6,7 and 9 but that plaintiff failed to include a prayer for relief for "each count" and allowed him leave to amend for that purpose. (Exhibit E ). The judge allowed the case to proceed, and referred it to the Commercial Section of the Law Division, Judge Thomas Mulroy.

6: When Amending the complaint, plaintiff added the United States as a defendant because the principal participant in the identity theft perpetrated against the plaintiff was a U.S.Postal Service employee, Mercedes Aldridge. This is when the U.S.Attorney's office Notice of Removal was filed.

In the matter of Firas Ayoubi 20-C-7288

7: This case was assigned to another judge first. Then sent to
the executive committee, where it was reassigned to Judge Thomas
Durken No 1:21-CV-06055. Judge Durken issued a "Minute Entry"
(Exhibit, ꞵ Doc#12 21-C-6055). In this entry he stated as follows:

> "[T]he Executive Committee has reassigned
> this judge to the matter. This case has
> been properly removed from the Circuit
> Court of Cook County. Firas M. Ayoubi is
> currently under an Executive Committee
> filing restriction...After reviewing
> the documents, the case is dismissed
> with prejudice fo failure to state a
> claim. Civil case terminated"

8: Subsequently, plaintiff provided Judge Dirken with a motion
to reinstate/reconsider (Doc 16) This Motion is attatched hereto
as exhibit C to this filing. In the motion he asked judge Durkin
to provide him with an order specifying the legal and factual
basis for the dismissal, and asked for the judge to be specific
as to what counts and which defendants are dismissed and why.
He explained that only the United States asked for dismissal
on the basis of failure by the plaintiff to seek permission to
sue from the United States postal service. He further notified
the judge that the judge in the Circuit Court allowed the State
law claims to proceed provided that plaintiff submit an amended
complaint which adds a prayer for relief for each count.

9: Judge Durkin did not respond to this motion which was filed
on 12/09/21. Further, plaintiff included proof in this motion
that he did in fact ask the United States Attorney General for
permission to sue on or about 9/8/2020. Which the U.S.Attorney
omitted from their filing. (Exh C)

<u>In the matter of Firas Ayoubi 20-C-7288</u>

10: On Jan 3 2022 Plaintiff submitted a "Request for Status and
disposition of Motion to Reconsider"(Doc14)(Exhibit D ). In
this filing plaintiff reiterated to judge Durkin that he never
received anything other than a minute entry and that he submitted
evidence showing he sought permission to sue from the U.S.Attorney
General. He also stated that "This court is violating Younger v
Harris and Heck v Humphrey abstention doctrines. It has no juris-
diction to override a state court decision on a matter of state
law"[ pertaining to the order from Judge O'brien in cook county].
Judge Durkin did not respond to this document.

11: On 4/15/22 plaintiff sent judge Durkin another motion,
"Request to Supplement Motion to Reconsider Doc#'s 14 and 16".
In this document he included the Orders from Judge O'Brien and
Judge Mulroy. (Exh E)

12: In Judge Mulroys order, it merely memorializes what judge
Durkin said in his minute entry (Exhibit E ). Plaintiff filed
a motion to reinstate the state claims back in the circuit court
(Exhibit F ) But the circuit court seemingly will not do anything
until judge Durkin issues an order clarifying that the state
claims are to be remanded back to state court. Plaintiff now
seems to be in a judicial purgatory. And no ability to challenge
anything. He is getting ignored by judge Durkin, is at a stand-
still in Circuit Court of Cook County, cant afford to appeal in

the Seventh Circuit, and has no other remedy at law other than
asking the U.S.Supreme Court for some type of writ.


13: This Executive Committee order, Per the very Executive
Committee order, does not, and should not affect the circuit
court case. It plainly states that. Secondly, judge Durkin's
order violates the soveregnty of the Illinois Courts and viol-
ates the abstention doctrines of the U.S.Supreme Court. See,
New Orleans Pub. Serv.,Inc. v. Counsil of New Orleans, "[A]lthough
the concern for comity and federalism has led to the expansion
of the protection of Younger beyond state criminal prosecutions,
to civil enforcement proceedings, **and even to civil proceedings**
**involving certain orders that are uniquelky in furtherance of**
**the state courts' ability to perform their judicial functions"**
id at HN10. See also Burford v Sun Oil Co.319 U.S. 315 (1943)
And see Sprint Communs. Inc. V. Jacobs 571 U.S.69 (2013). (Exh G)


14: The order by Judge Durkin, completely contravenes and goes
against the order by Judge O'Brien (Exhibit E ). How can a
state judge allow for amendment of the pleadings to add a prayer
for relief and verify that 7 of the counts on an issue of state
law can proceed provided a prayer for relief is added but then
a federal judge completely foreclose plaintiffs ability to amend
or proceed by terminating the case "with prejudice". Not because
of any pleading issue, but simply because of a executive committee
restricted filer order. This violates due process, and it should

<u>In the matter of Firas Ayoubi 20-C-7288</u>

not be what the purpose of the executive committee order was for.

15: Plaintiff needs some type of guidance from this court.
and a disposition on the motion to reconsider that has been
pending before judge Durkin for approximately 6 months with
no response.

WHEREFORE FIRAS AYOUBI prays the EXECUTIVE COMMITTEE issue
any order that would be appropriate in this situation.

Dated: May 18,2022                    RESPECTFULLY SUBMITTED

                                      By: /s/ _____


                                      Firas Ayoubi #R66956
                                      2600 N Brinton ave
                                      Dixon,IL,61021

In the matter of Firas Ayoubi 20-C-7288

## CERTIFICATE OF SERVICE

This is to certify that I have on this date served true and
correct copies of the foregoing upon:


**All** Counsel of Record **and,**

**Clerk of the U.S.District Court NDIll. and**

**Honorable Thomas Durkin**

Via CM/ECF electronic filing and notification system on this
/ 8 day of May 2022, and via U.S.Mail to Judge Durkin on the
same day by depositing the foregoing in the institutional
mailbox at the Dixon C.C. addressed to Judge Durkin via U.S.
Mail and the Clerk of Court via CM/ECF addressed to the instiutions
law library for proper efiling.

/s/ _____

Firas Ayoubi #R66956
Dixon C.C.
2600 N Brinton Ave.
Dixon IL,61021

In the matter of Firas Ayoubi 20-C-7288

## EXHIBIT TABLE OF CONTENTS

EXH A: Executive committee order

EXH B: Judge Durkin Dismissal

EXH C: Motion to Reconsider

EXH D: Request For Status on Motion to Reconsider

EXH E: Request to Supplement Motion to Reconsider and attatched
       orders fr m cook county Judges.

Exh F: Motion to Reinstate filed in cook county court

EXH G: Relevant Precedent from the U.S.Supreme Court in

       New Orleans Pub Serv Inc v. New Orleans 491 U.S.350 (1989)

       Sprint Communs Inc. V Jacobs 571 U.S. 69 (2013)

20-C-7288

Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of                          )
                                          )    Civil Action No.
                                          )
Firas M. Ayoubi                           )       20 C 7288

## EXECUTIVE COMMITTEE ORDER

Since November 2013, *pro se* Litigant Firas M. Ayoubi has filed 18 cases in this Court. In a November 2, 2020 order in case number 20 C 5665, *Ayoubi v. United States of America,* the Honorable Virginia Kendall noted that Mr. Ayoubi owed the Court $4,025.82 and referred him to the Executive Committee with a recommendation that he be "barred from filing further actions in this Court until he has paid in full all outstanding fees." Since that time, the Executive Committee has learned that the correct amount owed is $3,920.82.

The Executive Committee considered the order from Judge Kendall in addition to Mr. Ayoubi's filing history in the Court and sent him a Citation on February 26, 2021, directing him to respond in writing, explaining why he should not be barred from filing further actions in this Court until he pays all outstanding filing fees.

The Committee has reviewed Mr. Ayoubi's March 22, 2021 response to the Citation.

It is the judgment of the Executive Committee that reasonable and necessary restraints must be imposed upon Mr. Ayoubi's ability to file new civil cases in this District *pro se* or otherwise until he pays $3,920.82 in unpaid fees to the Court. Cases in existence prior to the entry of this order are not affected by this directive and shall proceed as usual.

**IT IS HEREBY ORDERED BY THE EXECUTIVE COMMITTEE** in its capacity as the supervisor of the assignment of cases, that ------

1)      Firas M. Ayoubi, or anyone, other than an attorney, acting on his behalf, is enjoined from filing any new civil action or proceeding in the United States District Court for the Northern District of Illinois without first obtaining leave by way of the following procedures:

   a)      Any materials Mr. Ayoubi, or anyone, other than an attorney, acting on his behalf, wishes to submit for filing shall be delivered to Room 2050, Office of the Clerk at the Courthouse in Chicago. Only the Clerk or deputies specifically designated by the Clerk may accept such documents.

   b)      Where the document submitted is a complaint, it shall be accompanied by a motion captioned a Motion Seeking Leave to File Pursuant to Order of Executive Committee. That motion shall, in addition to requesting leave to file the complaint, include a sworn statement certifying that the claims raised by or on behalf of Mr. Ayoubi in the complaint are new claims never before raised in any federal court.

Case: 1:20-cv-07288 Document #: 13 Filed: 05/19/22 Page 12 of 77 PageID #:149
Case: 1:21-cv-06093 Document #: 16 Filed: 12/08/21 Page 10 of 11 PageID #:100
Case: 1:21-cv-06093 Document #: 9-1 Filed: 10/25/21 Page 72 of 16 PageID #:174

c)    Whenever Mr. Ayoubi submits a document for filing, the clerk or designated deputy shall accept the papers, stamp them received, and forward them to the Executive Committee.

2)    The Executive Committee will examine any complaints submitted by or on behalf of Mr. Ayoubi to determine whether they should be filed.

3)    If Mr. Ayoubi seeks leave to proceed *in forma pauperis*, the Committee will also determine if such leave should be granted.    The Committee will deny leave to file any complaints if they are legally frivolous or are merely duplicative of matters already litigated.    The Committee may deny leave to file any complaints not filed in conformity with this order.

4)    If the Executive Committee enters an order denying leave to file the materials, the clerk will retain the order in a miscellaneous file with the title "In the matter of Firas M. Ayoubi" and cause a copy of the order to be mailed to Mr. Ayoubi.

5)    If the Executive Committee enters an order granting leave to file the materials, the clerk will cause the materials to be stamped filed as of the date received and will cause the case to be assigned to a judge in accordance with the rules.    The clerk will also cause a copy of the order to be mailed to Mr. Ayoubi.

6)    Mr. Ayoubi's failure to comply with this order may, within the discretion of the Executive Committee, result in his being held in contempt of court and punished accordingly.

7)    Nothing in this order will be construed ----

a)    to affect Mr. Ayoubi's ability to defend himself in any criminal action,

b)    to deny Mr. Ayoubi access to the federal courts through the filing of a petition for a writ of habeas corpus or other extraordinary writ, or

c)    to deny Mr. Ayoubi access to the United States Court of Appeals or the United States Supreme Court.

**IT IS FURTHER ORDERED** That any password issued to Firas M. Ayoubi for access to the electronic filing system will be disabled.

**IT IS FURTHER ORDERED** That any new complaints filed by Mr. Ayoubi and transferred to this Court from another jurisdiction will be reviewed by the Executive Committee to determine whether they should be filed.

**IT IS FURTHER ORDERED** that due to the outstanding fees owed by Plaintiff in prior cases, the trust fund officer at Plaintiff's place of incarceration is directed to collect 100 percent of any and all deposits to Plaintiff's account each month that deposits exceed $10 as long as the unpaid filing fees remain outstanding. The Court directs the trust fund officer to ensure that a copy of this order is mailed to each facility where Plaintiff is housed until the filing fees have been paid in full. All payments must be sent to the Clerk of Court, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604, attn: Cashier's Desk, 20th Floor, and should clearly identify Plaintiff's name and the case number assigned.

IT IS FURTHER ORDERED that unless he demonstrates to the Executive Committee in writing that he is in imminent danger of great bodily harm, Mr. Ayoubi may not submit a motion to modify or rescind this order until he has paid all outstanding fees.

IT IS FURTHER ORDERED that the Clerk will create and maintain a miscellaneous docket with the title "In the matter of Firas M. Ayoubi" and case number 20 C 7288. The miscellaneous docket will serve as the repository of this order and any order or minute order entered pursuant to this order. All orders will be entered on that docket following standard docketing procedures. A brief entry will be made on the docket indicating the receipt of any materials from Mr. Ayoubi, and

IT IS FURTHER ORDERED that the Clerk will cause a copy of this order to be mailed to Mr. Ayoubi at #R66956, Dixon C.C., 2600 N. Brinton Ave., Dixon, Illinois 61021, the address given by Mr. Ayoubi in a document dated March 22, 2021. Such mailing shall be by certified or registered mail, return receipt requested. The Clerk will also mail a copy of this order to the trust fund officer where the Plaintiff is housed.

ENTER:

FOR THE EXECUTIVE COMMITTEE

Hon. Rebecca R. Pallmeyer, Chief Judge

Dated at Chicago, Illinois this 26th day of April 2021

Exhibit B

Case: 1:21-cv-06055 Document #: 12 Filed: 11/22/21 Page 1 of 1 PageID #:86

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6.3.3
### Eastern Division

Firas Ayoubi

                    Plaintiff,

v.                                              Case No.: 1:21−cv−06055
                                                Honorable Thomas M. Durkin
U.S. Bank N.A., et al.

                              Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 22, 2021:

    MINUTE entry before the Executive Committee: The Executive Committee has
reassigned this judge to the matter. This case has been properly removed from the Circuit
Court of Cook County. Firas M. Ayoubi is currently under an Executive Committee filing
restriction, see: IN THE MATTER OF FIRAS M. AYOUBI (20 CV 7288). After
reviewing the documents, the case is dismissed with prejudice for failure to state a claim.
Civil case terminated. Mailed notice. (lw, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at *www.ilnd.uscourts.gov*.

Exhibit C

PC SCAN

FILED
12/9/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED
SM                    CR
12/9/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Honorable Thomas Durkin
United States District Court
219 S Dearborn St.
Chicago, IL, 60604

December 4th 2021

Firas Ayoubi #R66956
Dixon Correctional Center
2600 N Brinton Ave
Dixon, IL, 61021
Re: Ayoubi v U.S. Bank et al no 21-CV-06055

Dear Judge Durkin,

I received a minute entry (Doc #12) which stated that I'm under
an executive committee filing restriction and that this court,
after "reviewing the documents, the case is dismissed for failure
to state a claim" (Doc #12). There are a few issues to this entry.

First, I have no order from the court which specifically explains
why the case is dismissed with prejudice, and what the factual or
legal reasons were which justified the dismissal, or even what
in the complaint or part thereof constitutes "failure to state a
claim". Particularly, which of the 9 counts did the court determine
that I failed to state a claim. Indeed, only counts 2 and 8 involved
the United States and were the only two counts that I consider to
be related to their request for dismissal.

Importantly, the corporation/association defendants previously
filed motions to dismiss these very counts in the circuit court
of cook county. In their motions they also alleged I failed to
state a claim, but the circuit court allowed the negligence and
ciolation of privacy counts to proceed against the corporation
defendants, and did not dismiss any of the other claims against
Harlem Motors or their employees specifically. The circuit court
ruled that I did state a claim, but allowed me time to amend to
add a prayer for relief for each count, which I did. Under Federal
abstention  e.g. Younger v Harris, this court has no authority to

Hon Judge Durkin pg 2

No: 21-CV-06055

overide a state court judgment when the state court had jurisdiction
to allow the state law claims to proceed.

This court issued a blanket dismissal with prejudice without
taking into account that the state court had proper jurisdiction
of the state claims, and allowed them to proceed. Further, this
court did not issue an order identifying the reasons why I failed
to state a claim, or what part or count of the complaint failed to
state a claim. Importantly, this court did not issue an order
to remand the viable state claims back to the appropriate juris-
diction.

Likewise, this court did not grant me the opportunity to make
a showing that I did write the United States Attorney General at
the time, William Barr, asking for permission to sue and waiver
of soverign immunity over a year ago (Exhibit A). That the failure
to respond by the Attorney General constitutes a waiver of the
very defenses raised by the United States in their motion for
dismissal. But yet the United States produced an affidavit from
a Postal service tort claims representative, which the law says,
I dont need to specifically ask them, I was allowed to ask the
United States Attorney General. The United States did not mention
this. But yet the issue of whether or not I sought permission to
sue was the basis that I assume for the courts sua sponte dismissal
for failure to state a claim. Whether or not I wrote the United
States Attorney General is thus, material to the issue of whether
or not I state a claim.

Moreover, that I am clearly being punished by the Executive
Committee order, even though I did not refile these claims in this
venue, but the UNited States did. And to speculate that I found
a devious way around the executive committee order as the United
States suggested is ludicrous. I pursued the claims in the venue

that was appropriate given that the case was filed in that same
venue since September 2019, an entire year before the Executive
Committee order.

Importantly, given that that very case (Ayoubi v U.S.Bank et
al 2019-L-010219) was filed approximately a year before the exe-
cutive committee restrictive filer order, it is clearly not subject
to the executive committee order, see (Exhibit B)("cases in exis-
tance prior to the entry of this order are not affected by this
directive and shall proceed as usual")

The only thing that seems to be happening now is an ongoing
violation of my right to access the court system and dueprocess.
All because I couldnt afford the filing fee and was gravely
mistaken on what the legal definition of imminent danger was.
Its also violative of my first amendment, and violates Younger
v Harris and the soverignty of the Illinois Courts by the Federal
system.

I respectfully ask your Honor to please consider any of the
following, (a) consider reinstating the case or (b) issuing an
order identifying the legal or factual basis for the dismissal
for failure to state a claim, other than just the fact that I
have a restricted filer order against me so I may have the
opportunity to appeal if necessary or (c) issuing an order
identifying the state claims to be remanded back to the state
court system (d) or any other appropriate remedies this Honorable
court deems appropriate, just, and fair.

Hon Judge Durkin pg 4                          no 21-CV-06055




                              RESPECTFULLY SUBMITTED


                    /S/ _____




                         Firas Ayoubi #R66956
                         DIXON c.c.
                         2600 N Brinton ave
                         Dixon,IL,61021

no 21-CV-06055

## CERTIFICATE OF SERVICE

This is to certify that I have on this date served true and correct copies of the foregoing letter to judge Durkin upon,

United States Attorneys Office

219 S Dearborn St.
Chicago,IL,60604

via U.S.D.C. CM/ECF electronic filing and notification syststem on this __ day of December 2021 by depositing said document in the institutional mailbox at the Dixon C.C. addressed to the institutional lawlibrary for efiling.

/s/ _____

Firas Ayoubi #R66956
Dixon C.C.
2600 N Brinton Ave
Dixon,IL,61021

No 21-CV-06055

EXHIBIT A

**State of Illinois**
**Department of Corrections**

## CUMULATIVE COUNSELING SUMMARY

| Inmate/Resident/Release Name | | Register Number | Current Classification |
|---|---|---|---|
| AYOUBI, FIRAS | | R66956 | 2-A-N |

| Counselor/Agent Name * |
|---|
| BAKER, JOSHUA D. |

| Date/Time | Location | Type | Method | Staff/Title * |
|---|---|---|---|---|
| 9/8/2020 12:36:54 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | OUTGOING: DEPT OF JUSTICE; ATTY GEN WILLIAM BARR; 950 PENNSYLVANIA AVE; WASHINGTON DC 20530 | | | |
| 9/4/2020 14:02:46 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | GARDNER, FELECIA M., Correctional Counselor II |
| Comments: | Received and Responded to grievance #003695. Response sent to offender and copied to grievance officer. | | | |
| 9/4/2020 13:59:52 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | GARDNER, FELECIA M., Correctional Counselor II |
| Comments: | Received and Responded to grievance #004422. Response sent to offender and copied to grievance officer. | | | |
| 9/2/2020 10:21:58 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Other | SOLLARS, DAWN L., Corrections Parole Agent |
| Comments: | OUTGOING: LEYDIG, VOIT AND MAYER; 2 PRUDENTIAL PLAZA SUITE 4900; CHGO IL 60601 | | | |
| 9/2/2020 10:21:32 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Other | SOLLARS, DAWN L., Corrections Parole Agent |
| Comments: | OUTGOING: COOK CO CLERK; 50 W WASHINGTON ST ROOM 801; CHGO IL 60602 | | | |
| 9/1/2020 09:59:12 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Other | SOLLARS, DAWN L., Corrections Parole Agent |
| Comments: | OUTGOING: COOK CO CIRC CT; 50 W WASHINGTON ROOM 801; CHGO IL 60602 | | | |
| 8/31/2020 15:25:14 | CLINICAL SERVICES/DIX | Personal | Face To Face | GEE, TAYLOR L., Correctional Counselor II |
| Comments: | Offender requested and provided PAN List. | | | |
| 8/20/2020 14:54:45 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | HUSSUNG, CURTIS S., Correctional Counselor II |
| Comments: | Saw I/M during rounds on lockdown and received AUGUST phone list. Forwarded for processing. | | | |
| 8/18/2020 10:19:21 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | OUTGOING: COOK CO; LAW DIV; 50 W WASHINGTON ST; RM 801, CHGO IL 60602 | | | |
| 8/18/2020 10:19:01 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | OUTGOING: APPELLATE CT; CLERK; 55 SYMPHONY WAY; ELGIN IL 60120 | | | |
| 8/14/2020 14:14:45 | CLINICAL SERVICES/DIX | Personal | Grievance | BENITEZ, NICOLE M., Office Coordinator |
| Comments: | Grievance received in the G.O. and assigned #004422, dated 8/13/20 pertaining to STAFF CONDUCT. Grievance is being forwarded to Counselor for their review at the first level. | | | |
| 8/14/2020 10:33:35 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | HUSSUNG, CURTIS S., Correctional Counselor II |
| Comments: | Facilitated legal phone call in Bldg. 49 successfully. Atty. Jodi Garvey | | | |
| 8/7/2020 11:08:52 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | OUTGOING: LEYDIG VOIT & MAYER; CHARLES MOTTIER; 2 PRUDENTIAL PLAZA; STE 4900; CHGO IL 60601 | | | |
| 8/6/2020 08:47:31 | CLINICAL SERVICES/DIX | Personal | Grievance | BENITEZ, NICOLE M., Office Coordinator |
| Comments: | Received in the G.O., grievance #003694 with Counselor response dated 8/3/20. Grievance is being forwarded to the Grievance Officer for their review at the second level. | | | |
| 8/3/2020 09:24:09 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | BAKER, JOSHUA D., Correctional Counselor II |
| Comments: | Offender provided 1st level response to grievance # 003694 | | | |
| 7/31/2020 14:32:29 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Other | SOLLARS, DAWN L., Corrections Parole Agent |
| Comments: | INCOMING; HEYL ROYSTER; 105 W VANDALIA ST; PO BOX 467 STE 100; EDWARDSVILLE, IL 62025 | | | |
| 7/20/2020 10:51:58 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | INCOMING: BLEGEN & GARVEY; 53 W JACKSON BLVD; STE 1424; CHGO IL 60604 | | | |
| 7/17/2020 12:36:30 | GP NORTHWEST HOUSING UNIT/DIX | Personal | Face To Face | BAKER, JOSHUA D., Correctional Counselor II |
| Comments: | Conducted rounds due to Covid-19 quarantine, addressed general questions and concerns | | | |
| 7/17/2020 10:40:22 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | INCOMING: HEYL ROYSTER; 105 W VANDALIE ST; MARK TWAIN PLAZA III; STE 100; PO BOX 467; EDWARDSVILLE IL 62025 | | | |
| 7/16/2020 09:58:30 | MAILROOM/DIX | Personal | Other | PHILLIPS, JENNIFER, Office Administrator II |
| Comments: | INCOMING: HEYL ROYSTER; 105 W VANDALIA ST; MARK TWAIN PLAZA III; STE 100; PO BOX 467; EDWARDSVILLE IL 62025 | | | |

DOC 1711 (Rev. 10/86) PC Generated

*Assigned Counselor/Agent and Staff's title is current as of the date of this report, not the date of the counseling summary.

AYOUBI001052

NO 21-CV-06055

EXHIBIT B

Exhibit D

PC SCAN

RECEIVED AK

1/3/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Firas Ayoubi #R66956
Dixon Correctional Center
2600 N Brinton ave
Dixon,IL,61021

December 30,2021

Hon Thomas M.Durkin
District Judge
U.S.District Court ND.Ill
219 S Dearborn St.
Chicago,IL,60604

Request For Status and Disposition of Motion to reconsider
Re: Ayoubi v U.S.Bank et al 1:21-CV-06055

Dear Judge Durkin,

I filed a response to the United States's notice of removal and
filed a motion to reconsider dismissal with prejudice . The
court has not ruled on any of these motions. Further, all I
received in the mail was a minute entry stating the case was
dismissed with prejudice. I never received any order which
clarifies the legal or factual basis for the dismissal. Without
having such information I cannot adequately or fairly appeal
the decision, and I believe my right to access the court system
and due process rights were violated because I showed clear evidence
that I sought permission to sue from the United States Attorney
General approximately a year before filing the suit. Further,
this court reviewed the U.S. Attorneys affidavits and filings
without taking regard to my submissions. Even more, The state
law claims in the very suit were allowed to go through after
a hearing on the Defendants motion's to dismiss even before
this removal was authorized. Thus this court is violating the
Younger v Harris and Heck v Humphrey abstention doctrines. It
has no jurisdiction to override a state court decision on a matter
of state law. Please your Honor, send me the order and please
clarify that the state claims that were previously allowed to
proceed shall be sent back down to the state court.

Date: 12, 30, 2021

Thank you

s/

Exhibit E

PC SCAN

FILED    SH

4/15/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Honorable Thomas Durkin
United States District Judge
219 S Dearborn St.
Chicago,IL,60604

April 13,2022

Firas Ayoubi #R66956
Dixon Correctional Center
2600 N Brinton Ave.
Dixon,IL,61021

Re: Ayoubi v U.S.Bank et al 21-CV-06055

REQUEST TO SUPPLEMENT MOTION TO RECONSIDER DOC#'s 14 and 16

Dear Judge Durkin, I would respectfully request to supplement
the filed letters (motion to reconsider) with the attatched
orders from the Judge in the Circuit Court of Cook County Case
Ayoubi v U.S.Bank et Al 2019-L-010219. The attatched order shows
that the judge dismissed the claims without prejudice and granted
me leave to amend just to add the prayer for relief to each count.
This was right before the United States removed the case to the
federal court. The other order is from the circuit court of cook
county after you dismissed the case with prejudice. As you can see
your honor, The circuit court allowed the claims to proceed on
counts 1,3,4,5,6,7 provided that I add a prayer for relief. The
only party that requested dismissal of this case in the Federal
Court was the United States. Inever received an order from this
court which identified what was dismissed and what the legal or
factual basis of the dismissal was. I respectfully ask for the
court to specify that the United States and Mercedes Aldridge
(u.s.employee) are dismissed with prejudice (if the court decides
that I did not properly ask the U.S.Atty General for permission
to sue) In order for the state claims which previously allowed
to proceed in Circuit Court , go back to the circuit court. I
respectfully ask for an order remanding it back to the circuit
court. Because nothing will proceed in the state court until the
federal court specifies in the order so I may get the state claims
reinstated. Please also note your Honor, that this case was filed
long before any executive committee order (approx a year before)
in the circuit court of cook county. Please your Honor, I respectfully
ask for an order so I may seek reinstatement in the Circuit Court.

RESPECTFULLY SUBMITTED,

By: /s/

CC:
All Counsel of Record
Via CM/ECF on April 13,2022
(turned into institutional mail
to Dixon C.C.law library on 4/13/22)

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| FIRAS M. AYOUBI, *Pro Se,* | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2019-L-010219 |
| | ) | |
| v | ) | |
| | ) | |
| U.S. BANK N.A.; WAL-MART | ) | Calendar X |
| CORPORATION; SYNCRONY BANK; | ) | |
| HARLEM MOTORS INC.; AMERICAN | ) | |
| FAMILY INSURANCE COMPANY; | ) | |
| VERIZON WIRELESS; 700CREDIT | ) | |
| COMPANY; MERCEDES ALDRIDGE; | ) | |
| LOUAY IHMUD, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter coming to be heard on the section 2-615 motions to dismiss brought by Defendants U.S. Bank N.A., Wal-Mart Corporation, PNC Bank, and Verizon Wireless, and the Rule 103(b) Motion to Dismiss by American Family Insurance Company, the motions being fully briefed and the Court being fully advised, IT IS HEREBY ORDERED:

1. Counts 1, 3, 4, 5, 6, 7, and 9 of Plaintiff's Amended Complaint are dismissed without prejudice with leave to amend;

2. Plaintiff is granted leave to serve up to three interrogatories on U.S. Bank N.A. on or before September 29, 2021, limited to the identification of the employee(s) allegedly involved with running a credit check on Plaintiff; ·

3. U.S. Bank N.A. to serve answers to Plaintiff's interrogatories on or before October 27, 2021;

4. Plaintiff to file an amended complaint on or before November 15, 2021;

5. Defendants to answer or otherwise plead on or before December 20, 2021; and

6. American Family Insurance Company's Rule 103(b) Motion to Dismiss is entered and continued to the next status hearing;

7. A status hearing will be set after the case is reassigned to the Commercial Calendar of the Law Division; and

8. Defendants will send a copy of this order to Plaintiff.

*Order prepared by:*
Matthew D. Kelly – mkelly@smsm.com
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.
233 S. Wacker Drive, Suite 5500
Chicago, IL 60606
(312) 645-7800 - Firm No. 13681
*Attorneys for Verizon Wireless*

Judge _____

Dated

Judge Brendan A. O'Brien

SEP 20 2021

Circuit Court - 2175

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| FIRAS M. AYOUBI, *Pro Se*, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2019-L-010219 |
| | ) | |
| v | ) | |
| | ) | |
| U.S. BANK N.A.; WAL-MART | ) | Calendar X |
| CORPORATION; SYNCRONY BANK; | ) | |
| HARLEM MOTORS INC.; AMERICAN | ) | |
| FAMILY INSURANCE COMPANY; | ) | |
| VERIZON WIRELESS; 700CREDIT | ) | |
| COMPANY; MERCEDES ALDRIDGE; | ) | |
| LOUAY IHMUD, et al, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

This matter coming on to be heard on the Court's own motion, and the Court having been fully advised in the premises, IT IS HEREBY ORDERED:

This matter is transferred to the Presiding Judge, Law Division, Circuit Court of Cook County, Courtroom 2005, for reassignment to the Commercial Calendar Section of the Law Division.

*Order prepared by:*
Matthew D. Kelly – mkelly@smsm.com
SEGAL MCCAMBRIDGE SINGER & MAHONEY, LTD.
233 S. Wacker Drive, Suite 5500
Chicago, IL 60606
(312) 645-7800 – Firm No. 13681
*Attorneys for Verizon Wireless*

Judge

Judge Brendan A. O'Brien

Dated    SEP 20 2021

Circuit Court - 2175

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FIRAS M. AYOUBI. *Pro Se*.                )
                                          )
            Plaintiff.                     )        Case No. 2019-L-010219
                                          )
v                                          )
                                          )
U.S. BANK N.A.; WAL-MART                   )        Calendar X
CORPORATION: SYNCRONY BANK:                )
HARLEM MOTORS INC.; AMERICAN               )
FAMILY INSURANCE COMPANY:                  )
VERIZON WIRELESS: 700CREDIT                )
COMPANY: MERCEDES ALDRIDGE:                )
LOUAY IHMUD. et al.                        )
                                          )
            Defendants.                    )

### ORDER

This matter coming to be heard on the status of Plaintiff's Second Amended Complaint, Defendant U.S. Bank, N.A., American Family Insurance Company, and Verizon Wireless being present, and the Court being fully advised on the premise, IT IS HEREBY ORDERED:

1. On November 12, 2021, this matter was removed to the U.S. District Court for the Northern District of Illinois by newly added defendant United State of America as Case No. 1:21-cv-06055.

2. On November 22, 2021, this matter was dismissed with prejudice for failure to state a claim by Judge Thomas M. Durkin of the United States District Court for the Northern District of Illinois.  *4373*

3. Defendants will send a copy of this order to Plaintiff.

*Order prepared by:*
Matthew D. Kelly – mkelly@smsm.com
Patrick F. Sullivan – psullivan@smsm.com
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
233 S. Wacker Drive, Suite 5500
Chicago, IL 60606
(312) 645-7800 - Firm No. 13681
*Attorneys for Verizon Wireless*

Judge

Dated


ENTERED
Judge Thomas R. Mulroy-1941
NOV 3 0 2021
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

In, The Circuit Court Of Cook County
County Department, Law Division

)
) Case No: 2019-L-010219
Firas M. Ayoubi
    Plaintiff,                              ) Commercial Calendar

-vs-                                         ) Hon. Thomas Mulroy
U.S. Bank N.A. et al.
    Defendants                              )
                                             )

Plaintiff's Motion To Reinstate Cause

Now comes the Plaintiff FIRAS AYOUBI, and respectfully
moves the Honorable court to reinstate the claims/
case for the reasons set forth herein,

1. Plaintiff previously added Mercedes Aldridge, and her employer
The United States for various Federal violations.

2. The United States filed a notice of removal to Federal court on
11/19/2021, Essentially the United States claimed That Plaintiff
failed to obtain permission To Sue from the U.S. Postal Service
Tort claims Dept, and that Plaintiff failed to State a federal
Claim against the United States. No: 21-cv-06055 Doc#9.

3. The Federal court dismissed the Federal action on 11/22/21

4. Importantly, This court, in its 9/20/21 order allowed Plaintiff

leave to amend counts 1, 3, 4, 5, 6, 7, and 9. Plaintiff followed the courts order and amended the complaint, which is currently on file and served upon defendants.

5. Plaintiff voluntarily withdraws as Defendants — Mercedes Aldridge and the United States with prejudice.

6. Pursuant to The Illinois Constitution. This Honorable court has jurisdiction of the pending claims that were not related to The Federal Dismissal.

Wherefore Plaintiff Prays this Honorable court reinstate This cause and set the matter for hearing.

Dated: 12-22-2021

Respectfully Submitted

s/

Firas Ayoubi
#R66456
Dixon C.C.
2600 N. Brinton Ave
Dixon, IL, 61021



# Proof of Service

This is to certify under Penalty of Perjury and Section 1-109 of the code of Civil Procedure, that I sent true and correct copies of the foregoing

"Plaintiffs Motion To Reinstate Cause" upon:

(1) Barack Ferrazzano et al
mr. Nicholas Callahan
200 w. Madison, Suite 3900

(2) O'Hagan Meyer LLC
Lucas Sun
One E. Wacker Dr. Suite 3400

(3) Cole Sadkin LLC
20 S. Clark St. Suite 500
Chicago, IL, 60603

(4) Barnes & Mitchell
mr. Byron P. Mitchell
11 E. Adams St. Suite 1008
Chicago, IL, 60603

(5) Reed Smith LLP
ms. colette m. willer
10 S. Wacker Dr. 40th Fl.
Chicago, IL 60606

(6) Segal McCambridge et al
mr. Matthew D. kelly
233 S Wacker Dr. Suite.5500
Chicago, IL, 60606

(7) Clerk of the Circuit Court
Law Division RM 801
50 W. Washington St.
Chicago, IL, 60602

(8) Chambers of The Hon. Thomas Mulroy
Circuit Judge, commercial calendar
Law Division
50 w. Washington St. RM 801
Chicago, IL, 60602

Via United States mail, Postage Prepaid on this 22 Day of Dec. 2021

S/

Firas Ayoubi
#R66956
Dixon C.C.
2600 N. Brinton Ave
Dixon, IL, 8021

Exhibit G

Document: New Orleans Pub. Serv., Inc. v. Council of New Orlean...

---

## ⚠ New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350

Supreme Court of the United States

April 25, 1989, Argued ; June 19, 1989, Decided

No. 88-348

**Reporter**

**491 U.S. 350** * | 109 S. Ct. 2506 ** | 105 L. Ed. 2d 298 *** | 1989 U.S. LEXIS 3043 **** | 57 U.S.L.W. 4755 | 103 P.U.R.4th 49

NEW ORLEANS PUBLIC SERVICE, INC. v. COUNCIL OF THE CITY OF NEW ORLEANS ET AL.

**Prior History:** [****1] CERTIORARI TO THE UNITED **STATES** COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Disposition:** 850 F. 2d 1069, reversed and remanded.

## Core Terms

proceedings, **abstention**, district court, **federal** court, wholesale, costs, ratemaking, rates, pre-emption, **state**-court, injunction, railroad, cases, present case, retail rate, **state** court, electricity, challenges, enjoin, orders, circumstances, diversify, equitable, purposes, reactors, abstain, facial, **federal** law, inappropriate, regulations

## Case Summary

**Procedural Posture**

Plaintiff utility appealed a ruling of the United **States** Court of Appeals for the Fifth Circuit, which abstained from entertaining the utility's request for an injunction against defendant city council in a ratemaking proceeding. The lower courts found that the existence of a **state** court suit on the same issue required **federal abstention**.

**Overview**

An electric utility incurred costs to construct a nuclear power plant and was later held liable by the **Federal** Energy Regulatory Commission for 17 percent of the costs. A city council, acting as the local ratemaking authority, denied the utility reimbursement from its customers of $ 135 million of those costs, asserting that the utility had negligently incurred them. The utility sought a **federal** injunction to prevent the city council's order from taking effect, arguing that the order was pre-empted by **federal** law. The United **States** Supreme Court held that the district court should not have abstained from ruling on the injunction request, even though there was a pending **state** court action on the same issue. The Court found that the Burford doctrine did not apply because the case did not concern **state** law or disruption of **state** efforts to establish a coherent ratemaking policy. The Court further found that the Younger doctrine did not apply because it did not extend to **state** judicial proceedings for review of legislative or executive action, which the city council's order was found to be.

**Outcome**

The Court reversed the case, remanding for further proceedings, as **federal abstention** was not required.

## ▼ LexisNexis® Headnotes

Civil Procedure > Preliminary Considerations ▼ > **Federal** & **State** Interrelationships ▼ > **Abstention** ▼

Civil Procedure > ... > Jurisdiction ▾ > Jurisdictional Sources ▾ > General Overview ▾

*HN1* **Federal & State Interrelationships, Abstention**
**Federal** courts lack the authority to abstain from the exercise of jurisdiction that has been conferred. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (144)     1    ◆ 7

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

*HN2* **Federal & State Interrelationships, Abstention**
There are some classes of cases in which the withholding of authorized equitable relief because of undue interference with **state** proceedings is the normal thing to do. However, the areas in which such "**abstention**" is permissible are carefully defined, and it remains the exception, not the rule. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (54)     1     4

Administrative Law > 📄 Judicial Review ▾ > Reviewability ▾ > Questions of Law ▾

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

Civil Procedure > ... > Jurisdiction ▾ > Jurisdictional Sources ▾ > General Overview ▾

*HN3* **Reviewability, Questions of Law**
Under the Burford doctrine, where timely and adequate **state**-court review is available, a **federal** court sitting in equity must decline to interfere with the proceedings or orders of **state** administrative agencies: (1) when there are difficult questions of **state** law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of **federal** review of the question in a case and in similar cases would be disruptive of **state** efforts to establish a coherent policy with respect to a matter of substantial public concern. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (665)     12    ◆ 207

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

*HN4* **Federal & State Interrelationships, Abstention**
While the Burford doctrine is concerned with protecting complex **state** administrative processes from undue **federal** interference, it does not require **abstention** whenever there exists such a process, or even in all cases where there is a "potential for conflict" with **state** regulatory law or policy. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (226)    ⚠ 4    ◆ 26

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

Energy & Utilities Law > Electric Power Industry ▾ > **Federal** Power Act ▾
> General Overview ▾

*HN5* Federal & State Interrelationships, Abstention
There is no doctrine requiring **abstention** merely because resolution of a **federal** question may result in the overturning of a **state** policy. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (30)     1     5

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

Civil Procedure > Preliminary Considerations ▾ > Equity ▾ > Criminal Prosecutions ▾

*HN6* Federal & State Interrelationships, Abstention
Under the Younger doctrine, absent extraordinary circumstances **federal** courts should not enjoin pending **state** criminal prosecutions. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (122)     10

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾
> **Abstention** ▾

*HN7* Federal & State Interrelationships, Abstention
The mere assertion of a substantial constitutional challenge to **state** action will not alone compel the exercise of **federal** jurisdiction. That is so because when **federal** courts inquire into the substantiality of the **state**'s interest in its proceedings they do not look narrowly to its interest in the outcome of the particular case -- which could arguably be offset by a substantial **federal** interest in the opposite outcome. Rather, what **federal** courts look to is the importance of the generic proceedings to the **state**. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (94)     20

Energy & Utilities Law > Electric Power Industry ▾ > **State** Regulation ▾
> General Overview ▾

Governments > 📄 Police Powers ▾

*HN8*⬇ **Electric Power Industry, State Regulation**
The regulation of utilities is one of the most important of the functions traditionally associated with the police power of the **states**. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (11)    △ 2    ◆ 2

Civil Procedure > Preliminary Considerations ▾ > **Federal** & **State** Interrelationships ▾ > **Abstention** ▾

*HN9*⬇ **Federal & State Interrelationships, Abstention**
**Abstention** is not appropriate if the **federal** plaintiff will suffer irreparable injury absent equitable relief. Irreparable injury may possibly be established by a showing that the challenged **state** statute is flagrantly and patently violative of express constitutional prohibitions. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (32)    △ 1    ◆ 2

Civil Procedure > Preliminary Considerations ▾ > **Federal** & **State** Interrelationships ▾ > **Abstention** ▾

Governments > Courts ▾ > Judicial Comity ▾

Civil Procedure > Sanctions ▾ > Contempt ▾ > General Overview ▾

Civil Procedure > Sanctions ▾ > Contempt ▾ > Civil Contempt ▾

*HN10*⬇ **Federal & State Interrelationships, Abstention**
Although the concern for comity and federalism has led to the expansion of the protection of Younger beyond **state** criminal prosecutions, to civil enforcement proceedings, and even to civil proceedings involving certain orders that are uniquely in furtherance of the **state** courts' ability to perform their judicial functions, it has never been suggested that Younger requires **abstention** in deference to a **state** judicial proceeding reviewing legislative or executive action. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote (365)    △ 6    ◆ 80

Civil Procedure > Preliminary Considerations ▾ > **Fe**deral & **Stat**e Interrelationships ▾ > **Abstention** ▾

Civil Procedure > ... > Justiciability ▾ > Exhaustion of Remedies ▾ > General Overview ▾

Civil Procedure > Parties ⌄ > Intervention ⌄ > General Overview ⌄

*HN11* Federal & State Interrelationships, Abstention

When, in a proceeding to which Younger applies, a **state** trial court has entered **judgment**, the losing party cannot pursue equitable remedies in **federal** district court while concurrently challenging the trial court's **judgment** on appeal. For Younger purposes, the **state**'s trial-and-appeals process is treated as a unitary system, and for a **federal** court to disrupt its integrity by intervening in midprocess would demonstrate a lack of respect for the **state** as sovereign. For the same reason, a party may not procure **federal** intervention by terminating the **state** judicial process prematurely -- forgoing the **state** appeal to attack the trial court's **judgment** in **federal** court. A necessary concomitant of Younger is that a party wishing to contest in **federal** court the **judgment** of a **state** judicial tribunal must exhaust his **state** appellate remedies before seeking relief in the district court. ⌕ More like this Headnote

*Shepardize®* - Narrow by this Headnote (216)     2     22

Civil Procedure > Preliminary Considerations ⌄ > Federal & State Interrelationships ⌄
> Abstention ⌄

*HN12* Federal & State Interrelationships, Abstention

While the Younger doctrine has been extended beyond criminal proceedings, and even beyond proceedings in courts, it has never been extended to proceedings that are not judicial in nature. ⌕ More like this Headnote

*Shepardize®* - Narrow by this Headnote (13)     1

Energy & Utilities Law > Utility Companies ⌄ > Rates ⌄ > General Overview ⌄

*HN13* Utility Companies, Rates

Ratemaking is an essentially legislative act. ⌕ More like this Headnote

*Shepardize®* - Narrow by this Headnote (9)     1

⌄ Lawyers' Edition Display

**Decision**

**Federal** District Court's **abstention** from exercising jurisdiction over action by utility against local rate-making body which disallowed rate increase held improper.

**Summary**

In 1974, four wholly owned subsidiaries of a public utility holding company, each of which was a provider of electrical services within the holding company's utility system, agreed to finance another subsidiary's construction and operation of a nuclear reactor, in return for the right to the reactor's electrical output. In 1982, the four utilities filed with the **Federal** Energy Regulatory Commission (FERC) an agreement which contained the utilities' proposed allocation of the reactor's costs and output. In 1985, FERC issued a final order, in which it allocated reactor costs in proportion to each utility's share of system demand. One of the utilities, which had been allocated 17 percent of reactor costs, requested from the New Orleans City Council, which was the local rate-making body with final authority over the utility's retail rates, a rate increase to cover the increase in wholesale rates resulting from FERC's allocation of reactor costs. The council, which had appeared in the hearings before FERC on cost allocation and had advocated a 9 percent cost allocation to the utility, denied an immediate rate adjustment and **stated** that a public hearing was necessary to explore the utility's prudence in participating in contracts relating to the reactor. The utility responded by filing an action in the United **States** District Court for the Eastern District of Louisiana against the council, in which action the utility sought injunctive and declaratory relief on the ground that **federal** law required the court to allow the utility to recover its FERC-allocated share of reactor costs through an increase in retail rates. The **Federal** District Court dismissed the action, ruling that even if it had jurisdiction it would be compelled to abstain from exercising it by Burford v Sun Oil Co. (1943) 319 US 315, 87 L Ed 1424, 63 S Ct 1098. The United **States** Court of Appeals for the Fifth Circuit affirmed, holding that **abstention** was proper both under Burford and under Younger v Harris (1971) 401 US 37, 27 L Ed 2d 669, 91 S Ct 746. During the council's review, a second action filed in **Federal** District Court by the utility, in which it sought to preclude the council from requiring the utility's absorption of FERC-allocated costs, was dismissed as unripe, the District Court held in the alternative that **abstention** was appropriate, and such dismissal was affirmed by the Court of Appeals on ripeness grounds. In 1988, the Council completed its prudence review and entered a final order disallowing the recovery of $ 135 million of the utility's reactor costs through rate increases, based on the council's determinations that the utility's oversight of its obligation with respect to the reactor was deficient and that the utility had acted imprudently in failing to reduce the risk of its reactor commitment. Thereafter, the utility filed a third action in the **Federal** District Court, seeking declaratory and injunctive relief on the ground that the council's rate order was pre-empted by **federal** law. Anticipating that the **Federal** District Court might again abstain, the utility also filed a petition for review of the council's order in the Civil District Court for the Parish of Orleans, Louisiana. The **Federal** District Court dismissed the utility's action on **abstention** grounds, and the Court of Appeals affirmed, agreeing that the case was effectively controlled by its decision affirming the District Court's first dismissal, and thus that the Burford and Younger **abstention** doctrines applied (850 F2d 1069).

On certiorari, the United **States** Supreme Court reversed and remanded. In an opinion by Scalia, J., (1) joined by Brennan, White, Marshall, Stevens, O'Connor, and Kennedy, JJ., and joined as to the **judgment** by Rehnquist, Ch. J., it was held that **abstention** under the Burford doctrine was improper, because (a) the present case did not involve a **state** law claim, nor even an assertion that the utility's **federal** claims were in any way entangled in a skein of **state** law that had to be untangled before the **federal** case could proceed, (b) **federal** adjudication of the pre-emption claim would not disrupt the **state**'s attempt to insure uniformity in the treatment of an essentially local problem, (c) no inquiry beyond the four corners of the council's retail rate order was needed to determine whether the order was facially pre-empted by FERC's allocative decree and relevant **federal** statutory provisions, and such an inquiry would not unduly intrude into the processes of **state** government or undermine the **state**'s ability to maintain desired uniformity, and (d) analysis of the utility's alternative claim that the rate order's nominal emphasis on the utility's failure to diversify its power supply by selling off a portion of its reactor allocation was merely a cover for the council's determination that the utility's

original investment in the reactor was itself unwise did not demand significant familiarity with, and would not disrupt **state** resolution of, distinctly local regulatory facts or policies, and (2) joined by Rehnquist, Ch. J., and Brennan, White, Marshall, Stevens, O'Connor, and Kennedy, JJ., it was held that **abstention** under the Younger doctrine was improper, because--even assuming that such doctrine's **abstention** principles applied equally where the initial adjudicatory **state** tribunal was an agency--the rate-making proceeding before the council was legislative, rather than judicial, in nature and therefore was not the sort of proceeding entitled to treatment under the Younger doctrine.

Brennan, J., joined by Marshall, J., concurred, joining the court's opinion but expressing the view that the Younger doctrine was generally inapplicable to civil proceedings.

Rehnquist, Ch. J., concurring in part and concurring in the **judgment**, agreed that **abstention** under the Younger and Burford doctrines was inappropriate under the circumstances, but expressed the view that (1) nothing in the court's opinion curtailed application of the Younger doctrine to certain administrative proceedings which are judicial in nature, nor altered the rule that such proceedings should be regarded as ongoing for purposes of Younger **abstention** until **state** appellate review was completed, and (2) the possibility of Burford **abstention** should not be foreclosed in cases where the **state** has consolidated review of orders of local rate-making bodies in a specialized **state** court with power to hear a **federal** pre-emption claim.

Blackmun, J., concurred in the **judgment**, but expressed the view that (1) the court's understanding of Burford **abstention** was much narrower than his own in respects not relevant to the disposition of the case, and (2) he was not entirely persuaded that the court's previous decisions applying Younger **abstention** to administrative proceedings that are judicial in nature left open the question whether **abstention** must continue through the judicial review process.

## Headnotes

COURTS §230 > **federal** jurisdiction -- **abstention** from exercising -- Burford doctrine

-- action by utility against local rate-making authority -- disallowance of rate increase --

> Headnote:

*LEdHN[1A]* ⬇ [1A]*LEdHN[1B]* ⬇ [1B]*LEdHN[1C]* ⬇ [1C]*LEdHN[1D]* ⬇ [1D]*LEdHN*

*[1E]* ⬇ [1E]*LEdHN[1F]* ⬇ [1F]

A **Federal** District Court's **abstention**, under the doctrine of Burford v Sun Oil Co. (1943) 319 US 315, 87 L Ed 1424, 63 S Ct 1098--which held that a **federal** court sitting in equity may, under certain circumstances, properly decline to exercise its jurisdiction over an action challenging the validity of a **state** administrative order--from exercising jurisdiction over an action by a utility against a local rate-making authority, in which action the utility--which was one of four jointly owned utilities that, upon agreeing to finance the construction of a nuclear reactor in return for the right to the reactor's electrical output, were allocated varying percentages of the construction costs by the **Federal** Energy Regulatory Commission (FERC)--seeks declaratory and injunctive relief from the authority's order disallowing the utility's proposed retail rate increase on the ground that such order was pre-empted by **federal** law, is improper where (1) such action does not involve a **state** law claim, nor even an assertion that the utility's **federal** claims are in any way entangled in a skein of **state** law that must be untangled before the **federal** case can proceed, (2) **federal** adjudication of the pre-emption claim would not disrupt the **state**'s attempt to insure uniformity in the treatment of an essentially local problem, (3) no inquiry beyond the four corners of the authority's retail rate order is needed to determine whether the order is facially pre-empted by FERC's allocative decree and relevant **federal** statutory provisions, and such an inquiry--while potentially resulting in an injunction against enforcement of the rate order--would not

unduly intrude into the processes of **state** government or undermine the **state**'s ability to maintain desired uniformity, and (4) analysis of the utility's alternative claim that the rate order's nominal emphasis on the utility's failure to diversify its power supply by selling off a portion of its reactor allocation was merely a cover for the authority's determination that the utility's original investment in the reactor was itself unwise--while demanding some level of industry-specific expertise--does not demand significant familiarity with, and will not disrupt **state** resolution of, distinctly local regulatory facts or policies, since wholesale electricity is not bought and sold within a predominantly local market.

COURTS §696 > **federal** injunction against **state** proceedings -- **abstention** -- Younger doctrine -- action by utility against local rate-making authority -- disallowance of rate increase -- > Headnote:

*LEdHN[2A]* [2A]*LEdHN[2B]* [2B]*LEdHN[2C]* [2C]*LEdHN[2D]* [2D]*LEdHN [2E]* [2E]*LEdHN[2F]* [2F]*LEdHN[2G]* [2G]

A **Federal** District Court's **abstention**, under the doctrine of Younger v Harris (1971) 401 US 37, 27 L Ed 2d 669, 91 S Ct 746--which held that **federal** courts should not enjoin pending **state** court proceedings except under special circumstances--from exercising jurisdiction over an action by a utility against a local rate-making authority, in which action the utility--which was one of four jointly owned utilities that, upon agreeing to finance the construction of a nuclear reactor in return for the right to the reactor's electrical output, were allocated varying percentages of the construction costs by the **Federal** Energy Regulatory Commission, and which also had a suit pending in **state** court for review of the authority's order disallowing the utility's proposed retail rate increase--seeks declaratory and injunctive relief on the ground that the authority's order was pre-empted by **federal** law, is improper because--even assuming that the Younger doctrine's **abstention** principles apply equally where the initial adjudicatory **state** tribunal is an agency--the rate-making proceeding before the authority was legislative, rather than judicial, in nature and therefore was not the sort of proceeding entitled to treatment under the Younger doctrine; the utility's pending **state** court action for review of the authority's order, as a challenge to completed legislative action, thus does not represent the interference with ongoing judicial proceedings against which the Younger doctrine is directed, even though the District Court's disposition may well effect, or for practical purposes pre-empt, the pending **state** court action.

COURTS §230 > source of **federal** jurisdiction -- **abstention** -- > Headnote:

*LEdHN[3]* [3]

Congress, and not the judiciary, defines the scope of **federal** jurisdiction within the permissible bounds of the **Federal** Constitution; **federal** courts lack the authority to abstain from the exercise of jurisdiction that has been conferred; and **federal** courts' **abstention**, in the sense of exercising the discretion to withhold certain types of relief in order to avoid undue interference with **state** proceedings, is the exception, not the rule.

COURTS §757 > **federal abstention** -- **state** administrative proceedings --

> Headnote:

*LEdHN*[*4A*] [4A]*LEdHN*[*4B*] [4B]

Where timely and adequate **state** court review is available, a **federal** court sitting in equity must decline to interfere with the proceedings or orders of **state** administrative agencies (1) when there are difficult questions of **state** law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar, or (2) where the exercise of **federal** review of the question in a case and in similar cases would be disruptive of **state** efforts to establish a coherent policy with respect to a matter of substantial public concern; while such doctrine is concerned with protecting complex **state** administrative processes from undue **federal** interference, it does not require **abstention** whenever there exists such a process, or even in all cases where there is a potential for conflict with **state** regulatory law or policy.

COURTS §757 > **abstention** -- **federal** question -- **state** policy --  > Headnote:

*LEdHN*[*5*] [5]

There is no doctrine requiring **federal** court **abstention** merely because resolution of a **federal** question may result in the overturning of a **state** policy.

COURTS §230 > **federal** courts -- duty to exercise jurisdiction --  > Headnote:

*LEdHN*[*6*] [6]

While there is no greater **federal** interest in enforcing the supremacy of **federal** statutes than in enforcing the supremacy of explicit guarantees under the **Federal** Constitution, and while constitutional challenges to **state** action--no less than challenges to **state** action based on **federal** pre-emption--call into question the legitimacy of a **state**'s interest in its proceedings reviewing or enforcing that action, the mere assertion of a substantial constitutional challenge to **state** action where such **state** proceedings are pending will not alone compel the exercise of **federal** jurisdiction by a **federal** court; instead, the appropriate question is whether the **state** has a substantial, legitimate interest in its proceedings, and in considering such question the United **States** Supreme Court does not look narrowly to the **state**'s interest in the outcome of the particular case--which could arguably be offset by a substantial **federal** interest in the opposite outcome--but instead looks to the importance of the generic proceedings to the **state**.

PUBLIC UTILITIES §3 > **state** regulation --  > Headnote:

*LEdHN*[*7*] [7]

The regulation of utilities is one of the most important of the functions traditionally associated with the police power of the **states**.

COURTS §691 > **federal** injunction against **state** proceedings -- **abstention** --

> Headnote:

*LEdHN[8]* [8]

A **federal** court's **abstention** from enjoining pending **state** proceedings is inappropriate if the **federal** plaintiff will suffer irreparable injury absent equitable relief.

COURTS §696 > **STATES**, TERRITORIES, AND POSSESSIONS §36 > **federal** injunction against **state** proceedings -- **abstention** -- pre-emption -- regulation of utility rates --

> Headnote:

*LEdHN[9]* [9]

A facially conclusive claim of **federal** pre-emption, which claim might render a **federal** court's **abstention** from enjoining pending **state** proceedings inappropriate, is not made out where a local utility-rate-making authority, in the course of its proceedings and rate-making order which disallowed a proposed retail rate increase by a utility-- which was one of four jointly owned utilities that, upon agreeing to finance the construction of a nuclear reactor in return for the right to the reactor's electrical output, were allocated varying percentages of the construction costs and reactor power and had wholesale electricity rates set by the **Federal** Energy Regulatory Commission (FERC)-- did not seek directly to regulate interstate wholesale utility rates, did not question the validity of the FERC-prescribed allocation of power or wholesale rates, and did not re-examine the prudence of the utility's agreement to participate in the construction and operation of the reactor, but rather took the normal rate-making step of making the utility's shareholders rather than rate-payers bear the consequences of the utility's failure to diversify its power supply portfolio, and where such step was not directly or even indirectly foreclosed by the relevant **federal** statute, the regulations implementing it, or the case law applying it.

COURTS §757 > duty of **federal** court to decide case -- > Headnote:

*LEdHN[10]* [10]

Only exceptional circumstances justify a **federal** court's refusal to decide a case in deference to the **states**.

COURTS §691 > **federal** injunction against **state** proceedings -- **abstention** --

exhaustion of **state** appellate remedies -- > Headnote:

*LEdHN[11]* [11]

When, in a **state** proceeding to which the doctrine of **federal abstention** from enjoining **state** proceedings applies, a **state** trial court has entered **judgment**, the losing party cannot pursue equitable remedies in **Federal** District Court while concurrently challenging the trial court's **judgment** on appeal; a **state**'s trial-and-appeals process is treated as a unitary system, and for a **federal** court to disrupt its integrity by intervening in mid-process would demonstrate a lack of respect for the **state** as sovereign; for the same reason, a party may not procure **federal** intervention by terminating the **state** judicial process prematurely, foregoing the **state** appeal to

attack the trial court's **judgment** in **federal** court; a necessary concomitant of this doctrine is that a party wishing to contest in **federal** court the **judgment** of a **state** judicial tribunal must exhaust **state** appellate remedies before seeking relief in **Federal** District Court.

COURTS §92.7 > ripeness -- distinction between function of court and of legislature --

> Headnote:

*LEdHN[12A]* ⬇ [12A] *LEdHN[**12B**]* ⬇ [12B]

A claim by a utility--which was one of four jointly owned utilities that, upon agreeing to finance the construction of a nuclear reactor in return for the right to the reactor's electrical output, were allocated varying percentages of the construction costs by the **Federal** Energy Regulatory Commission--that a local rate-making authority's order disallowing the utility's proposed retail rate increase was pre-empted by **federal** law is ripe for review in **federal** court where a pending **state** court review of such order is not an extension of the authority's legislative rate-making process, but rather involves the judicial act of declaring the utility's rights vis-a-vis the authority on present or past facts and under laws supposed already to exist.

## Syllabus

The **Federal** Energy Regulatory Commission (FERC) allocated the cost of the Grand Gulf 1 nuclear reactor among several jointly owned companies, including petitioner New Orleans Public Service, Inc. (NOPSI), that had agreed to finance the reactor's construction and operation. NOPSI, which provides retail electrical service to New Orleans, then sought from respondent New Orleans City Council (Council), the local ratemaking body, a rate increase to cover the increase in its wholesale rates resulting from FERC's allocation of Grand Gulf costs. Although deferring to FERC's implicit finding that NOPSI's decision to participate in the Grand Gulf venture was reasonable, the Council determined that the costs incurred thereby should not be completely reimbursed through a rate increase because NOPSI's management was negligent in failing, after the risks of nuclear power became apparent, to diversify its supply portfolio by selling a portion of its Grand Gulf power. NOPSI filed a petition in **state** court for review of the Council's final rate order. In parallel [****2] **federal** proceedings in the District Court, NOPSI sought declaratory and injunctive relief on the ground that the Council's order was pre-empted by **federal** law under *Nantahala Power & Light Co.* v. *Thornburg*, 476 U.S. 953, which held that, for purpose of setting intrastate retail rates, a **State** may not differ from FERC's allocations of wholesale power by imposing its own **judgment** of what would be just and reasonable. The District Court concluded that it should abstain from deciding the suit under *Burford* v. *Sun Oil Co.*, 319 U.S. 315, and *Younger* v. *Harris,* 401 U.S. 37. The Court of Appeals affirmed.

*Held:* The District Court erred in abstaining from exercising jurisdiction. Pp. 358-373.

(a) The *Burford* **abstention** doctrine -- under which **federal** equity courts must decline to interfere with complex **state** regulatory schemes in cases involving (1) difficult **state**-law questions bearing on policy problems of substantial public import, or (2) efforts to establish a coherent **state** policy regarding a matter of substantial public concern -- is not applicable. This case does [****3] not involve a **state**-law claim, nor even an assertion that NOPSI's **federal** claims are in any way entangled in a skein of **state** law that must be unraveled before the **federal** case can proceed. Because NOPSI's facial pre-emption claim may be resolved without venturing beyond the four corners of the Council's rate order, **federal** adjudication of that claim would not unduly intrude into **state** governmental process or undermine the **State**'s ability to maintain desired uniformity in the treatment of essentially local problems. Although NOPSI's alternative claim -- that the rate order's nominal emphasis

on NOPSI's failure to diversify its power supply was merely a cover for the determination that the original Grand Gulf investment was itself unwise -- cannot be resolved on the face of the order, resolution of that claim does *not* demand significant familiarity with, and will not disrupt **state** resolution of, distinctively local facts or policies, since wholesale electricity is not bought and sold within a predominantly local market. Pp. 360-364.

(b) Nor is **abstention** appropriate under *Younger*, which held that, absent extraordinary circumstances, traditional equity concerns and principles [****4] of comity require **federal** courts to refrain from enjoining pending **state** criminal prosecutions. This Court has expanded *Younger* **abstention** beyond criminal proceedings, and even beyond proceedings in courts, but never to proceedings that are not "judicial in nature." The Council proceedings at issue here are not judicial in nature, since ratemaking, which establishes a rule for the future, is essentially a legislative act. See, *e. g., Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226-227. Nor can the proceedings in this case be considered a unitary and still-to-be-completed legislative process by virtue of the ongoing **state**-court review proceedings. There is no contention here that the Louisiana courts' review involves anything other than a judicial act -- that is, the declaration of NOPSI's rights vis-a-vis the Council on present or past facts under existing law. NOPSI's pre-emption claim was therefore ripe for **federal** review when the Council completed the legislative action by entering its final order. Pp. 364-373.

**Counsel:** Rex E. Lee argued the cause for petitioner. With him on the briefs were David W. Carpenter, Thomas O. Lind, Herschel [****5] L. Abbott, Jr., David G. Radlauer, and Edward H. Bergin.

Richard J. Lazarus argued the cause for the United **States** et al. as amici curiae urging reversal. With him on the brief were Acting Solicitor General Bryson, Deputy Solicitor General Shapiro, Catherine C. Cook, Jerome M. Feit, and Robert H. Solomon.

Clinton A. Vince argued the cause for respondents. With him on the brief were Bernhardt K. Wruble, Nancy A. Wodka, and Okla Jones II. [* ⬇]

**Judges:** Scalia, J., delivered the opinion of the Court, in which Brennan, White, Marshall, Stevens, O'Connor, and Kennedy, JJ., joined, and in Parts I and II-B of which Rehnquist, C. J., joined. Brennan, J., filed a concurring opinion, in which Marshall, J., joined, post, p. 373. Rehnquist, C. J., filed an opinion concurring in part and concurring in the **judgment**, post, p. 373. Blackmun, J., filed [****6] an opinion concurring in the **judgment**, post, p. 374.

**Opinion by:** SCALIA

## Opinion

[*352] [***306] [**2509] JUSTICE SCALIA delivered the opinion of the Court.

*LEdHN[1A]* [1A] *LEdHN[2A]* [2A] In *Nantahala Power & Light Co.* v. *Thornburg*, 476 U.S. 953 [**2510] (1986), we held that for purposes of setting intrastate retail rates a

**State** may not differ from the **Federal** Energy Regulatory Commission's allocations of wholesale power by imposing its own **judgment** of what would be just and reasonable. Last Term, in *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U.S. 354 (1988), we held that FERC's allocation of the $ 3 billion-plus cost of the Grand Gulf 1 nuclear reactor among the operating companies that jointly agreed to finance its construction and operation pre-empted Mississippi's inquiry into the prudence of a utility retailer's decision to participate [***307] in the joint venture. Today we confront once again a legal issue arising from the question of who must pay for Grand Gulf 1. Here the **state** ratemaking authority deferred to FERC's implicit finding that New Orleans Public Service, Inc.'s decision to participate in the Grand Gulf venture was reasonable, but determined [****7] that the costs incurred thereby should not be completely reimbursed because, it asserted, the utility's management was negligent in failing later to diversify its supply portfolio by selling a **[*353]** portion of its Grand Gulf power. Whether the **State's** decision to provide less than full reimbursement for the FERC-allocated wholesale costs conflicts with our holdings in *Nantahala* and *Mississippi Power & Light* is not at issue in this case. Rather, we address the threshold question whether the District Court, which the utility petitioned for declaratory and injunctive relief from the **state** ratemaking authority's order, properly abstained from exercising jurisdiction in deference to the **state** review process.

I

Because the **abstention** questions at stake here have little to do with the intricacies of the factual and procedural history underlying the controversy, we may sketch the background of this case in brief. [1⬇] Petitioner New Orleans Public Service, Inc. (NOPSI), a producer, wholesaler, and retailer of electricity that provides retail electrical service to the city of New Orleans, is one of four wholly owned operating subsidiaries of Middle South Utilities, Inc. Middle [****8] South operates an integrated "power pool" in which each of the four operating companies transmits produced electricity to a central dispatch center and draws back from the dispatch center the power it needs to meet customer demand. In 1974, NOPSI and its fellow operating companies entered a contract with Middle South Energy, Inc. (MSE), another wholly owned Middle South subsidiary, whereby the operating companies agreed to finance MSE's construction and operation of two 1250 megawatt nuclear reactors, Grand Gulf 1 and 2, in return for the right to the reactors' electrical output. The estimated cost of completing the two reactors was $ 1.2 billion.

During the late 1970's, consumer demand turned out to be far lower than expected, and regulatory delays, enhanced construction requirements, and [****9] high inflation led to spiraling **[*354]** costs. As a result, construction of Grand Gulf 2 was suspended, and the cost of completing Grand Gulf 1 alone eventually exceeded $ 3 billion. Not surprisingly, the cost of the electricity produced by the reactor greatly exceeded that of power generated by Middle South's conventional facilities.

Acting pursuant to its exclusive regulatory authority over interstate wholesale power transactions, 49 Stat. 847, as amended, 16 U. S. C. § 824 *et seq.*, FERC conducted extensive proceedings to determine "just and reasonable" rates for Grand Gulf 1 power and to prescribe a "just, reasonable, and nondiscriminatory" allocation of [***308] Grand Gulf's costs and output. In June 1985, the Commission issued a final order, *Middle South Energy, Inc.*, 31 FERC para. 61,305, [**2511] rehearing denied, 32 FERC para. 61,425 (1985), aff'd *sub nom. Mississippi Industries* v. *FERC*, 257 U. S. App. D. C. 244, 808 F. 2d 1525, rehearing granted and vacated in part, 262 U. S. App. D. C. 42, 822 F. 2d 1104, [****10] cert. denied, 484 U.S. 985 (1987), in which it concluded that, because the planned nuclear reactors had been designed "to meet overall System needs and objectives," 31 FERC, p. 61,655, the Middle South subsidiaries should pay for the Grand Gulf project "roughly in proportion to each company's share of System demand," *id.*, at 61,655-61,656. The Commission allocated 17 percent of Grand Gulf costs (approximately $ 13 million per month) to NOPSI, rejecting Middle South's proposal of 29.8 percent as well as the 9 percent figure favored by the respondent here, the New Orleans City Council.

> "Although it did not expressly discuss the 'prudence' of constructing Grand Gulf and bringing it on line, FERC implicitly accepted the uncontroverted testimony of [Middle South] executives who explained why they believed the decisions to construct and to complete Grand Gulf 1 were sound, and approved the finding that 'continuing construction of Grand Gulf Unit No. 1 was prudent because

Middle South's executives believed Grand **[*355]** Gulf would enable the Middle South system to diversify its base load fuel mix [****11] and, it was projected, at the same time, produce power for a total cost (capacity and energy) which would be less than existing alternatives on the system.'" *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U.S., at 363, quoting *Middle South Energy, Inc.*, 26 FERC para. 63,044, pp. 65,112-65,113 (1984).

When NOPSI sought from the New Orleans City Council (Council) -- the local ratemaking body with final authority over the utility's retail rates, see 16 U. S. C. § 824(b); La. Rev. Stat. Ann. §§ 33:4405, 33:4495 (West 1988); Home Rule Charter of the City of New Orleans § 4-1604 (1986), as amended by Ordinance No. 8264 M. C. S., as amended by Ordinance No. 10340 M. C. S. -- a rate increase to cover the increase in wholesale rates resulting from FERC's allocation of Grand Gulf costs, the Council denied an immediate rate adjustment, explaining that a public hearing was necessary to explore "'the legality and prudency *[sic]* of the [contracts relating to Grand Gulf 1, and] the prudency *[sic]* and reasonableness of the said expenses.'" Brief for United **States** et [****12] al. as *Amici Curiae* 5, quoting Council Resolution R-85-423. NOPSI responded by filing an action for injunctive and declaratory relief in the United **States** District Court for the Eastern District of Louisiana, asserting that **federal** law *required* the Council to allow it to recover, through an increase in retail rates, its FERC-allocated share of the Grand Gulf expenses.

The District Court granted the Council's motion to dismiss, holding that pursuant to the Johnson Act, 28 U. S. C. § 1342, it had no jurisdiction to entertain the action, and that even if it had jurisdiction it would be compelled to abstain under *Burford* v. *Sun Oil Co.*, 319 U.S. 315 [***309] (1943), to abstain. On appeal, the Fifth Circuit initially reversed on both grounds, but later, on its own motion, vacated its earlier opinion in part and held that **abstention** was proper both under *Burford* and under **[*356]** *Younger* v. *Harris*, 401 U.S. 37 (1971). *New Orleans Pub. Serv., Inc.* v. *New Orleans*, 782 F. 2d 1236, modified, 798 F. 2d 858 (1986), cert. denied, [****13] 481 U.S. 1023 (1987) *(NOPSI I)*.

By resolution of October 10, 1985, while *NOPSI I* was still pending before the Fifth Circuit, the Council initiated an investigation into the prudence of NOPSI's involvement in Grand Gulf 1. Resolution R-85-636 **stated** the Council's intention to examine all aspects of NOPSI's relationship with Grand Gulf, including NOPSI's "'efforts to minimize its total cost exposure for the purchase,'" and Grand Gulf's "'impact on its other power supply opportunities,'" "'for the purpose of determining what portion, [**2512] if any, of NOPSI's Grand Gulf 1 expense shall be assumed by [NOPSI's] shareholders.'" App. 113-114. The resolution specifically provided, however, that in setting the appropriate retail rate, the Council would "'not seek to invalidate any of the agreements surrounding Grand Gulf 1 or to order NOPSI to pay MSE a rate other than that approved by the FERC.'" *Id.*, at 114.

In November 1985, NOPSI filed a second suit in the United **States** District Court for the Eastern District of Louisiana, seeking to preclude the Council from requiring NOPSI or its shareholders to absorb any of NOPSI's FERC-allocated share of the Grand [****14] Gulf costs. The District Court dismissed the suit as unripe, but held in the alternative that **abstention** was appropriate. On appeal, the Fifth Circuit affirmed the **judgment** on ripeness grounds. *New Orleans Pub. Serv., Inc.* v. *Council of New Orleans*, 833 F. 2d 583 (1987).

The Council completed its prudence review on February 4, 1988, and immediately entered a final order disallowing $ 135 million of the Grand Gulf costs. The order was based on the Council's determinations that "NOPSI's . . . oversight and review of its Grand Gulf obligation . . . was uncritical and severely deficient," App. 24, and that NOPSI acted imprudently in failing

to reduce the risk of its Grand Gulf commitment, in the wake of the Three Mile Island nuclear incident in **[*357]** March 1979, "by selling all or part of its share off-system," *id.*, at 24-25.

Upon receipt of the Council's decree, NOPSI turned once again to the District Court for the Eastern District of Louisiana, seeking declaratory and injunctive relief on the ground that, in light of this Court's recent decision in *Nantahala Power & Light Co.* v. *Thornburg*, 476 U.S. 953 (1986), **[****15]** the Council's rate order was pre-empted by **federal** law. Although the District Court expressed considerable doubt as to the merits of the Council's position on the pre-emption question, [2⬆] it concluded that, notwithstanding **[***310]** *Nantahala*, it should still abstain from deciding the suit.

 **[****16]** Anticipating that the District Court might again abstain, NOPSI had filed a petition for review of the Council's order in the Civil District Court for the Parish of Orleans, Louisiana. As filed, NOPSI's petition raised only **state**-law claims and **federal** due process and takings claims, but NOPSI informed **[*358]** the **state** court by letter that it would amend to raise its **federal** pre-emption claim if the **federal** court once again dismissed its complaint. When that happened, it did so. [3⬆]

 **[****17]** **[**2513]** In the parallel **federal** proceedings, the Fifth Circuit affirmed the District Court's dismissal, agreeing that the case was effectively controlled by *NOPSI I, i. e.*, that *Burford* and *Younger* **abstention** applied. 850 F. 2d 1069 (1988). We granted certiorari. 488 U.S. 1003 (1989).

II

*LEdHN[3]⬆* [3]Before proceeding to the merits of the **abstention** issues, it bears emphasis that the Council does not dispute the District Court's *jurisdiction* to decide NOPSI's pre-emption claim. Our cases have long supported the proposition that *HN1⬆* **federal** courts lack the authority to abstain from the exercise of jurisdiction that has been conferred. For example: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." *Cohens* v. *Virginia*, 6 Wheat. 264, 404 (1821). "'[T]he courts of the United **States** are bound to proceed to **judgment** and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of **[****18]** another jurisdiction.'" *Chicot County* v. *Sherwood*, 148 U.S. 529, 534 (1893) (citations omitted). "When a **Federal** court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to **[*359]** take **[***311]** such jurisdiction. . . . The right of a party plaintiff to choose a **Federal** court where there is a choice cannot be properly denied." *Willcox* v. *Consolidated Gas Co.*, 212 U.S. 19, 40 (1909) (citations omitted). Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of **federal** jurisdiction within the constitutionally permissible bounds. *Kline* v. *Burke Construction Co.*, 260 U.S. 226, 234 (1922).

That principle does not eliminate, however, and the categorical assertions based upon it do not call into question, the **federal** courts' discretion in determining whether to grant certain types of relief -- a discretion that was part of the common-law background against which the statutes conferring jurisdiction were enacted. See Shapiro, Jurisdiction and Discretion, 60 N. Y. U. L. Rev. 543, 570-577 (1985). **[****19]** Thus, *HN2⬆* there are some classes of cases in which the withholding of authorized equitable relief because of undue interference with **state** proceedings is "the normal thing to do," *Younger* v. *Harris*, 401 U.S., at 45. We have carefully defined, however, the areas in which such **"abstention"** is permissible, and it remains "'the exception, not the rule.'" *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 236 (1984), quoting *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 813 (1976). As recently as last Term we described the **federal** courts' obligation to adjudicate claims within their jurisdiction as "'virtually unflagging.'" *Deakins* v. *Monaghan*, 484 U.S. 193, 203 (1988) (citation omitted).

*LEdHN[1B]⬆* [1B]*LEdHN[2B]⬆* [2B]With these principles in mind, we address the question whether the District Court, relying on *Burford* v. *Sun Oil Co.*, 319 U.S. 315 (1943), and *Younger* v. *Harris, supra*, properly declined to exercise its jurisdiction in the present case. While we acknowledge that "[t]he **[***20]** various types of **abstention** are not rigid pigeonholes into which **federal** courts must try to fit cases," *Pennzoil Co.* v. *Texaco Inc.*, 481

U.S. 1, 11, n. 9 (1987), [**2514] the policy considerations supporting *Burford* [*360] and *Younger* are sufficiently distinct to justify independent analyses.

A

In *Burford* v. *Sun Oil Co., supra,* a **Federal** District Court sitting in equity was confronted with a Fourteenth Amendment challenge to the reasonableness of the Texas Railroad Commission's grant of an oil drilling permit. The constitutional challenge was of minimal **federal** importance, involving solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations. *Id.,* at 331, and n. 28. Because of the intricacy and importance of the regulatory scheme, Texas had created a centralized system of judicial review of commission orders, which "permit[ted] the **state** courts, like the Railroad Commission itself, to acquire a specialized knowledge" of the regulations and industry, *id.,* at 327. We found the **state** courts' review [****21] of commission decisions "expeditious and adequate, [***312] " *id.,* at 334, and, because the exercise of equitable jurisdiction by comparatively unsophisticated **Federal** District Courts alongside **state**-court review had repeatedly led to "[d]elay, misunderstanding of local law, and needless **federal** conflict with the **state** policy," *id.,* at 327, we concluded that "a sound respect for the independence of **state** action requir[ed] the **federal** equity court to stay its hand," *id.,* at 334.

We applied these same principles in *Alabama Pub. Serv. Comm'n* v. *Southern R. Co.,* 341 U.S. 341 (1951), where a railroad sought to enjoin enforcement of an order of the Alabama Public Service Commission refusing permission to discontinue unprofitable rail lines. According to the railroad, requiring continued operation of the lines amounted to confiscation of property in violation of **federal** due process rights. Under Alabama law, a party dissatisfied with a final order of the Public Service Commission had an absolute right of appeal to the Circuit Court of Montgomery County, which [****22] was "empowered to set aside any Commission order found to be contrary to the substantial weight of the evidence or erroneous [*361] as a matter of law." *Id.,* at 348. This right of statutory appeal "concentrated in one circuit court" which exercised "supervisory" powers was, we found, "an integral part of the regulatory process under the Alabama Code." *Ibid.* Taking account of the unified nature of the **state** regulatory process, and emphasizing that "adequate **state** court review of [the] administrative order [was] available," *id.,* at 349, and that the success of the railroad's constitutional challenge depended upon the "predominantly local factor of public need for the service rendered," *id.,* at 347, we held that the District Court ought to have abstained from exercising its jurisdiction, *id.,* at 350.

**LEdHN[4A]** [4A]From these cases, and others on which they relied, we have distilled the principle now commonly referred to as **HN3** the "*Burford* doctrine." Where timely and adequate **state**-court review is available, a **federal** court sitting in equity must decline to interfere with [****23] the proceedings or orders of **state** administrative agencies: (1) when there are "difficult questions of **state** law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of **federal** review of the question in a case and in similar cases would be disruptive of **state** efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation Dist.* v. *United States, supra,* at 814.

**LEdHN[1C]** [1C]The present case does not involve a **state**-law claim, nor even an assertion that the **federal** claims are "in any way entangled in a skein of **state** law that must be untangled before the **federal** case can proceed," *McNeese* v. *Board of Education for* [**2515] *Community Unit School Dist. 187, Cahokia,* 373 U.S. 668, 674 (1963).The Fifth Circuit acknowledged as much in *NOPSI I,* but found "the absence of a **state** law claim . . . not fatal" because, it thought, "[t]he motivating force behind *Burford* **abstention** [***313] is . . . a reluctance to intrude into **state** proceedings where there exists a complex **state** [****24] regulatory system." 798 F. 2d, at 861-862. Finding that this case [*362] involved a complex regulatory scheme of "paramount local concern and a matter which demands local administrative expertise," *id.,* at 862, it held that the District Court appropriately applied *Burford.*

**LEdHN[1D]** [1D]**LEdHN[4B]** [4B]**HN4** While *Burford* is concerned with protecting complex **state** administrative processes from undue **federal** interference, it does not require **abstention** whenever there exists such a process, or even in all cases where there is a "potential for conflict" with **state** regulatory law or policy. *Colorado River Water Conservation*

*Dist.*, 424 U.S., at 815-816. Here, NOPSI's primary claim is that the Council is prohibited by **federal** law from refusing to provide reimbursement for FERC-allocated wholesale costs. Unlike a claim that a **state** agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant **state**-law factors, **federal** adjudication of this sort of pre-emption claim would not disrupt the **State**'s attempt to ensure uniformity in the treatment of an "essentially local problem," [****25] *Alabama Pub. Serv. Comm'n, supra,* at 347.

LEdHN[1E]🔝 [1E]LEdHN[5]🔝 [5]That *Burford* **abstention** is not justified in these circumstances is strongly suggested by our decision in *Public Util. Comm'n of Ohio* v. *United Fuel Gas Co.*, 317 U.S. 456 (1943), decided just four months prior to *Burford*, in which a District Court had enjoined on **federal** pre-emption grounds a **State**'s attempt to fix interstate gas rates. After determining that the **State**'s order impinged on the authority Congress had vested solely in the **Federal** Power Commission, we addressed the **State**'s contention that the District Court had nonetheless abused its discretion by granting injunctive relief:

> "It is perhaps unnecessary at this late date to repeat the admonition that the **federal** courts should be wary of interrupting the proceedings of **state** administrative tribunals by use of the extraordinary writ of injunction. But this, too, is a rule of equity and not to be applied in blind disregard of fact. And what are the commanding circumstances **[\*363]** of the present case? First, and most important, the orders of the **state** Commission are on their face plainly invalid. [****26] *No inquiry beyond the orders themselves and the undisputed facts which underlie them is necessary in order to discover that they are in conflict with the **federal** Act.*" 317 U.S., at 468-469 (emphasis added).

Similarly in the case at bar, no inquiry beyond the four corners of the Council's retail rate order is needed to determine whether it is facially pre-empted by FERC's allocative decree and relevant provisions of the **Federal** Power Act. Such an inquiry would not unduly intrude into the processes of **state** government or undermine the **State**'s ability to maintain desired uniformity. It may, of course, result in an injunction against enforcement of the rate order, but "*HN5*🔝 there is . . . no doctrine requiring **abstention** merely because resolution of a **federal** question may result in the overturning of a **state** policy." *Zablocki* v. *Redhail*, 434 U.S. 374, 380, n. 5 [***314] (1978).

LEdHN[1F]🔝 [1F]It is true that in its initial complaint, NOPSI asserted, as an alternative to its facial pre-emption challenge, that the rate order's nominal emphasis on NOPSI's failure in 1979-1980 to diversify its power supply by selling off a portion of its [****27] Grand Gulf allocation was merely a cover for the determination that the original Grand Gulf investment was itself unwise. Unlike the facial challenge, this claim cannot be resolved on the face of the rate order, because it hinges largely on the plausibility [**2516] of the Council's finding that NOPSI should have, and could have, diversified its supply portfolio and thereby lowered its average wholesale costs. See n. 2, *supra*. Analysis of this pretext claim requires an inquiry into industry practice, wholesale rates, and power availability during the relevant time period, an endeavor that demands some level of industry-specific expertise. But since, as the facts of this case amply demonstrate, wholesale electricity is not bought and sold within a predominantly local **[\*364]** market, it does *not* demand significant familiarity with, and will

not disrupt **state** resolution of, distinctively local regulatory facts or policies. The principles underlying *Burford* are therefore not implicated.

B

*LEdHN[2C]* [2C]*HN6* In *Younger* v. *Harris*, 401 U.S. 37 (1971), which involved a facial First Amendment-based challenge to the California Criminal Syndicalism Act, we held that [****28] absent extraordinary circumstances **federal** courts should not enjoin pending **state** criminal prosecutions. That far-from-novel holding was based partly on traditional principles of equity, *id.*, at 43-44, but rested primarily on the "even more vital consideration" of comity, *id.*, at 44. As we explained, this includes "a proper respect for **state** functions, a recognition of the fact that the entire country is made up of a Union of separate **state** governments, and a continuance of the belief that the National Government will fare best if the **States** and their institutions are left free to perform their separate functions in their separate ways." *Ibid.*

The **state**-court proceeding at issue here is not a criminal prosecution, and one of the issues in the present case is whether the principle of *Younger* can properly be extended to this type of suit. NOPSI argues that that issue does not have to be reached, however, for several reasons. First, NOPSI argues that *Younger* does not require **abstention** in the face of a substantial claim that the challenged **state** action is completely pre-empted by **federal** law. Such a claim, [****29] NOPSI contends, calls into question the prerequisite of *Younger* **abstention** that the **State** have a legitimate, substantial interest in its pending proceedings, *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U.S. 423, 432 (1982). Thus, it contends, a district court presented with a pre-emption-based request for equitable relief should take a quick look at the merits; and if upon that look the claim appears substantial, the court should endeavor to resolve it.

[*365] *LEdHN[6]* [6] *LEdHN[7]* [7]We disagree. There is no greater **federal** interest in enforcing [***315] the supremacy of **federal** statutes than in enforcing the supremacy of explicit constitutional guarantees, and constitutional challenges to **state** action, no less than pre-emption-based challenges, call into question the legitimacy of the **State**'s interest in its proceedings reviewing or enforcing that action. Yet it is clear that *HN7* the mere assertion of a substantial constitutional challenge to **state** action will not alone compel the exercise of **federal** jurisdiction. See *Younger*, 401 U.S., at 53. That is so because when we inquire into the substantiality of the **State**'s [****30] interest in its proceedings we do not look narrowly to its interest in the *outcome* of the particular case -- which could arguably be offset by a substantial **federal** interest in the opposite outcome -- Rather, what we look to is the importance of the generic proceedings to the **State**. In *Younger*, for example, we did not consult California's interest in prohibiting John Harris from distributing handbills, but rather its interest in "carrying out the important and necessary task" of enforcing its criminal laws. *Id.*, at 51-52. Similarly, in *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986), we looked not to Ohio's specific concern with Dayton Christian Schools' firing of Linda Hoskinson, but to its more general interest in preventing [**2517] employers from engaging in sex discrimination. *Id.*, at 628. Because pre-emption-based challenges merit a similar focus, the appropriate question here is not whether Louisiana has a substantial, legitimate interest in regulating NOPSI's retail rate below that necessary to recover its wholesale costs, but whether it has a substantial, [****31] legitimate interest in regulating intrastate retail rates. It clearly does. *HN8* "[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the **States**." *Arkansas Electric Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). Accord, *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190, 205-206 [*366] (1983); *Central Hudson Gas & Electric Corp.* v. *Public Serv. Comm'n of New York*, 447 U.S. 557, 569 (1980).

NOPSI attempts to avoid this conclusion by stressing that it challenges not only the result of the Council's deliberations, but the very right of the Council to conduct those deliberations. (This argument assumes, of course, that enjoining the Louisiana **state** courts can be equated with enjoining the Council proceedings, a point we shall address in due course.) But that is simply not true, if the reference to "the Council's deliberations" is as generic as it should be. NOPSI does not deny that the **State** has an interest affirmatively protected [****32] by **federal** law in conducting proceedings to set intrastate retail electricity rates; rather, it

contends that under the particular facts of the present case its FERC-allocated wholesale costs are not a proper subject for such proceedings. That is no different from the contention in *Younger* that the defendant's violation of the particular (allegedly unconstitutional) **state** statute was not a proper subject of prosecution. In other words, this argument of NOPSI ultimately reduces once [***316] again to insistence upon too narrow an analytical focus.

*LEdHN[8]* [8]*LEdHN[9]* [9]NOPSI's second argument to the effect that **abstention** is improper even assuming the **state** proceedings here are the sort to which *Younger* applies rests upon the principle that *HN9* **abstention** is not appropriate if the **federal** plaintiff will "suffer irreparable injury" absent equitable relief. *Younger*, 401 U.S., at 43-44; see also *id.*, at 48. Irreparable injury may possibly be established, *Younger* suggested, by a showing that the challenged **state** statute is "'flagrantly and patently violative of express constitutional prohibitions . . .,'" *id.*, at 53-54, [****33] quoting *Watson* v. *Buck*, 313 U.S. 387, 402 (1941). Relying on *Public Util. Comm'n of Ohio* v. *United Fuel Gas Co.*, 317 U.S. 456 (1943), where we upheld the order of a District Court enjoining the **State** Public Utilities Commission from attempting directly to regulate interstate gas prices because such actions were "*on their face plainly invalid*," *id.*, at 469 (emphasis added), NOPSI asserts that *Younger*'s posited [*367] exception for **state** statutes "flagrantly and patently violative of express constitutional prohibitions" ought to apply equally to **state** proceedings and orders flagrantly and patently violative of **federal** pre-emption (which is unlawful only because it violates the express constitutional prescription of the Supremacy Clause). Thus, NOPSI argues, even if a *substantial* claim of **federal** pre-emption is not sufficient to render **abstention** inappropriate, at least a *facially conclusive* claim is. Perhaps so. But we do not have to decide the matter here, since the proceeding and order at issue do not meet that description. The Council has not sought directly to [****34] regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's [**2518] agreement to participate in Grand Gulf 1 in the first place. Rather, the Council maintains that it has examined the prudence of NOPSI's failure, after the risks of nuclear power became apparent, to diversify its supply portfolio, and that finding that failure negligent, it has taken the normal ratemaking step of making NOPSI's shareholders rather than the ratepayers bear the consequences. Nothing in this is directly or even indirectly foreclosed by the **federal** statute, the regulations implementing it, or the case law applying it. There may well be reason to doubt the Council's necessary factual finding that NOPSI would have saved money had it diversified. See n. 2, *supra*. But we cannot conclusively say it is wrong without further factual inquiry -- and what requires further factual inquiry can hardly be deemed "flagrantly" unlawful for purposes of a threshold **abstention** determination.

*LEdHN[2D]* [2D]*LEdHN[10]* [10]We conclude, therefore, that NOPSI's challenge must stand or [****35] fall upon the answer to the question whether the Louisiana court action is the type of proceeding to which *Younger* applies. Viewed in isolation, it plainly is not. *HN10* Although our concern for comity and federalism has led us to [*368] expand the protection of *Younger* beyond **state** criminal prosecutions, to civil enforcement proceedings, *Huffman* v. *Pursue*, [***317] *Ltd.*, 420 U.S. 592, 604 (1975); *Trainor* v. *Hernandez*, 431 U.S. 434, 444 (1977); *Moore* v. *Sims*, 442 U.S. 415, 423 (1979), and even to civil proceedings involving certain orders that are uniquely in furtherance of the **state** courts' ability to perform their judicial functions, see *Juidice* v. *Vail*, 430 U.S. 327, 336, n. 12 (1977) (civil contempt order); *Pennzoil Co.* v. *Texaco Inc.*, 481 U.S. 1, 13 (1987) (requirement for the posting of bond pending appeal), it has never been suggested that *Younger* requires **abstention** in deference to a **state** judicial proceeding reviewing legislative or executive action. Such a broad **abstention** requirement [****36] would make a mockery of the rule that only exceptional circumstances justify a **federal** court's refusal to decide a case in deference to the **States**. *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S., at 817; *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U.S. 1, 25 (1983); cf. *Moore* v. *Sims*, *supra*, at 423, n. 8 ("[W]e do not remotely suggest 'that every pending proceeding between a **State** and a **federal** plaintiff justifies **abstention** unless one of the exceptions to *Younger* applies'" (citation omitted)).

*LEdHN[2E]* [2E]*LEdHN[11]* [11]In asserting that *Younger* is applicable, however, respondents focus not upon the Louisiana court action in isolation, but upon that action as a mere continuation of the Council proceeding. Their contention is that "[t]he Council's own ratemaking and prudence inquiry, even though complete, constitutes an 'ongoing proceeding' because it is subject to **state** judicial review." Brief for Respondents 31. The proper question,

they contend, is whether the *Council proceeding* qualified for *Younger* treatment -- because if it did, the proceeding [****37] is not complete until judicial review is concluded. Respondents argue by analogy to the treatment of court proceedings, for *Younger* purposes, as an uninterruptible whole. *HN11* When, in a proceeding to which *Younger* applies, a **state** trial court has entered **judgment**, the losing **[*369]** party cannot, of course, pursue equitable remedies in **federal** district court while concurrently challenging the trial court's **judgment** on appeal. For *Younger* purposes, the **State**'s trial-and-appeals process is treated as a unitary system, and for a **federal** court to disrupt its integrity by intervening in midprocess would demonstrate a lack of respect for the **State** as sovereign. For the same reason, a party may not procure **federal** intervention by terminating the **state** judicial process prematurely -- forgoing the **state** appeal to attack the trial court's **judgment** [**2519] in **federal** court. "[A] necessary concomitant of *Younger* is that a party [wishing to contest in **federal** court the **judgment** of a **state** judicial tribunal] must exhaust his **state** appellate remedies before seeking relief in the District Court." *Huffman* v. *Pursue, Ltd., supra*, at 608. Respondents urge [****38] that these principles apply equally where the initial adjudicatory tribunal is an agency -- *i. e.*, that the litigation, from agency through courts, is to be viewed as a unitary process that should not be disrupted, so that **federal** intervention is no more permitted at the conclusion of the administrative stage than during it.

*LEdHN[2F]* [2F]We will assume, without deciding, [***318] that this is correct. 4 ⬇
Respondents' case for **abstention** still requires, however, that the *Council proceeding* be the sort of proceeding entitled to *Younger* treatment. We think it is not. *HN12* While we have expanded **[*370]** *Younger* beyond criminal proceedings, and even beyond proceedings in courts, we have never extended it to proceedings that are not "judicial in nature." See *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U.S., at 433-434 ("It is clear beyond doubt that the New Jersey Supreme Court considers its bar disciplinary proceedings as 'judicial in nature.' As such, the proceedings are of a character to warrant **federal**-court deference"). See also *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U.S., at 627 [****39] ("Because we found that the administrative proceedings in *Middlesex* were 'judicial in nature' from the outset, . . . it was not essential to the decision that they had progressed to **state**-court review by the time we heard the **federal** injunction case"). The Council's proceedings in the present case were not judicial in nature.

[****40] In *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210 (1908), several railroads requested a **Federal** Circuit Court "to enjoin . . . the Virginia **State** Corporation Commission from publishing or taking any steps to enforce a certain order fixing passenger rates," on the ground that the proposed rates were confiscatory. *Id.*, at 223. To decide whether the **federal** court was at liberty to issue the requested injunction, we examined first the nature of the challenged agency action. Under Virginia law the commission was invested with both legislative and judicial powers, and we assumed, without deciding, that "if it were proceeding against [a railroad] to enforce [the rate] order or to punish [the railroad] for a breach, "it then would be sitting as a court and would be protected from interference on the part of courts of the United **States**," *id.*, at 226. But, upon analysis, we found the proceedings in the case at hand to be legislative. Justice Holmes, writing for the Court, explained as follows:

> "A judicial inquiry investigates, declares and enforces liabilities as they stand on present [****41] or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future **[*371]** and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of [***319] a rate is the making of a rule for the future, and therefore [**2520] is an act legislative and not judicial in kind. . . ." *Ibid.*

He then considered and rejected the notion that the nature of the agency's proceedings might depend on their form:

> "[The proper characterization of an agency's actions] depends not upon the character of the body but upon the character of the proceedings. . . . And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. . . . The nature of the final

act determines the nature of the previous inquiry. As the judge is bound to declare the law he must know or discover the facts that establish the law. So when [****42] the final act is legislative the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case." *Id.*, at 226-227 (citations omitted).

We have since reaffirmed both the general mode of analysis of *Prentis*, see *District of Columbia Court of Appeals* v. *Feldman*, 460 U.S. 462, 476-479 (1983), and its specific holding that *HN13* ratemaking is an essentially legislative act, *Colorado Interstate Gas Co.* v. *FPC*, 324 U.S. 581, 589 (1945). Thus, the Council's proceedings here were plainly legislative.

*LEdHN[12A]* [12A]That characterization does not, however, end the inquiry. In *Prentis*, while we found the challenged agency proceeding legislative in character, we nonetheless held equitable intervention inappropriate because, we determined, the attack on the rate order was premature. Although we made clear that those challenging the rates "were not bound to wait for proceedings [*372] brought to enforce the rate and to punish them for departing from it," 211 U.S., at 228, because [****43] Virginia provided for legislative review of commission rates by appeal to the **state** courts, we concluded that the challengers "should make sure that the **State** in its final legislative action would not respect what they think their rights to be, before resorting to the courts of the United **States**." *Id.*, at 230. We were as concerned, in other words, to preserve the integrity of a unitary and still-to-be-completed legislative process as we were, under *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592 (1975), to preserve the integrity of judicial proceedings. Similarly in the present case, if the Louisiana courts' review of Council ratemaking was legislative in nature, NOPSI's challenge to the Council's order should have been dismissed as unripe.

There is no contention here that the Louisiana courts' review involves anything other than a judicial act -- that is, not "the making of a rule for the future," but the declaration of NOPSI's rights vis-a-vis the Council "on present or past facts and under laws supposed already to exist," *Prentis, supra*, at 226. Nor does there seem to be room for such a contention. [****44] See [***320] *State ex rel. Guste* v. *Council of New Orleans*, 309 So. 2d 290, 294-296 (La. 1975). Since the **state**-court review is not an extension of the legislative process, NOPSI's pre-emption claim was ripe for **federal** review when the Council's order was entered. See *Lane* v. *Wilson*, 307 U.S. 268, 274-275 (1939); *Bacon* v. *Rutland R. Co.*, 232 U.S. 134, 138 (1914).

*LEdHN[2G]* [2G]*LEdHN[12B]* [12B]As a challenge to completed legislative action, NOPSI's suit represents neither the interference with ongoing judicial proceedings against which *Younger* was directed, nor the interference with an ongoing legislative process against which our ripeness holding in *Prentis* was directed. It is, insofar as our policies of **federal** comity are concerned, no different in substance from a facial challenge to an allegedly unconstitutional statute or zoning ordinance -- which we would assuredly not require to be [**2521] brought in **state** courts. See *Wooley* v. [*373] *Maynard*, 430 U.S. 705, 711 (1977). It is true, of course, that the **federal** court's disposition of such a case may well affect, [****45] or for practical purposes pre-empt, a future -- or, as in the present circumstances, even a pending -- **state**-court action. But there is no doctrine that the availability or even the pendency of **state** judicial proceedings excludes the **federal** courts. Viewed, as it should be, as no more than a **state**-court challenge to completed legislative

action, the Louisiana suit comes within none of the exceptions that *Younger* and later cases have established.

For the reasons **stated**, the **judgment** of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

**Concur by:** BRENNAN; REHNQUIST (In Part); BLACKMUN

## Concur

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

I join the Court's opinion. I continue to adhere to my view, however, that the **abstention** doctrine of *Younger* v. *Harris*, 401 U.S. 37 (1971), is in general inapplicable to civil proceedings. See *Pennzoil Co.* v. *Texaco Inc.*, 481 U.S. 1, 19 (1987) (Brennan, J., concurring in **judgment**); *Trainor* v. *Hernandez*, 431 U.S. 434, 450 (1977) (Brennan, J., dissenting); *Juidice* v. *Vail*, 430 U.S. 327, 341 (1977) [****46] (Brennan, J., dissenting); *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592, 613 (1975) (Brennan, J., dissenting).

CHIEF JUSTICE REHNQUIST, concurring in Parts I and II-B and concurring in the **judgment**.

I agree with the Court that our prior cases extending *Younger* beyond criminal prosecutions to civil proceedings have limited its application to proceedings which are "judicial in nature," and that, under our longstanding characterization of the distinction between "judicial" and "legislative" proceedings, see *Prentis* v. *Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908), the Council's ratemaking proceedings at issue here were not judicial in nature. Under these circumstances, **[*374]** I agree that *Younger* **abstention** [***321] is inappropriate, despite the pendency of **state**-court review of the Council's ratemaking order. Nothing in the Court's opinion curtails our prior application of *Younger* to certain administrative proceedings which *are* "judicial in nature," see *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986); *Middlesex County Ethics Committee* v. *Garden State Bar Assn.*, 457 U.S. 423 (1982); [****47] nor does it alter our prior case law indicating that such proceedings should be regarded as "ongoing" for the purposes of *Younger* **abstention** until **state** appellate review is completed, see *Dayton Christian Schools, supra*, at 629. With this understanding, I join the portion of the Court's opinion holding that *Younger* **abstention** is inappropriate here.

I agree with the Court's conclusion that *Burford* **abstention** is inappropriate on the facts of this case. But I would not foreclose the possibility of *Burford* **abstention** in a case like this had the **State** consolidated review of the orders of local ratemaking bodies in a specialized **state** court with power to hear a **federal** pre-emption claim. Accordingly, I concur only in the **judgment** as to *Burford* **abstention**.

JUSTICE BLACKMUN, concurring in the **judgment**.

I concur in the **judgment** in this case. I also agree with what I take to be the core of the majority's reasoning: in the posture of this case, a legislative proceeding ended when the Council entered its ratemaking order; after that point, adjudication in the District Court would not have interfered with any *ongoing* proceeding, be it [****48] judicial, quasi-legislative, or legislative. *Ante*, at 372. [**2522] I find, however, that the majority's understanding of *Burford* **abstention** is much narrower than my own in respects not relevant to the disposition of this case, and that there is considerable tension between its discussion of the nature of the **State**'s interests in the *Burford* context and its discussion of the **State**'s interests in the *Younger* context. Compare *ante*, at 362-363, with *ante*, at 366-367. Furthermore, I am not entirely persuaded **[*375]** that this Court's decisions applying *Younger* **abstention** to administrative proceedings that are judicial in nature leave open the question whether **abstention** must continue through the judicial review process. *Ante*, at 369, and n. 4. In my

view, the majority's observations on these questions are not necessary to the result or to the legal standard the majority has adopted.

## References

32A Am Jur 2d, **Federal** Practice and Procedure 1797, 1834

1 **Federal** Procedure, L Ed, Access to District Courts 1:577, 1:614

US L Ed Digest, Courts 230, 696, 757

Index to Annotations, **Abstention** Doctrine; [****49] Utilities; Younger Doctrine

Annotation References:

Supreme Court's views as to application to noncriminal proceedings of rule against **federal** judicial intervention in pending or threatened **state** proceedings. 73 L Ed 2d 1416.

Supreme Court's definition and application of doctrine of "**abstention**" where questions of **state** law are controlling in **federal** civil case. 20 L Ed 2d 1623, 58 L Ed 2d 862.

**Footnotes**

[*] Briefs of *amici curiae* urging affirmance were filed for the National Association of Regulatory Utility Commissioners by *William Paul Rodgers, Jr.*; for the National League of Cities et al. by *Benna Ruth Solomon* and *Charles Rothfeld*; and for the Pennsylvania Public Utility Commission by *Lawrence F. Barth* and *John F. Povilaitis*.

[1] For a more in-depth account of the factual and regulatory history of the Grand Gulf nuclear power project, see *Mississippi Power & Light Co.* v. *Mississippi ex rel. Moore*, 487 U.S. 354 (1988).

[2]

Adverting to the merits, the District Court commented: "[T]he Council faults NOPSI not for buying a 'pig in a poke' but for failing to find a sucker to buy it when the faux-pas became apparent. n.11

n.11 "P. T. Barnum once said of suckers: 'There's one born every minute.' This court, however, is not ready to assume there are many, if any, such suckers purchasing electricity in the wholesale market today. Indeed, this court is somewhat mystified by the Council's logic in arriving at the $ 135 million disallowance in the Rate Order. In the Rate Order, the Council simply concluded that since [NOPSI's President] said so, savings were actually possible. Then, the Council seemingly pulled from thin air a figure of 8% for the prudence disallowance. However, the Council, and in this case, everyone else knows that the 8% figure was not pulled from thin air but represents the difference between FERC's 17% allocation and what NOPSI consistently claims as its relative share of the [Middle South] system [and what the Council advocated unsuccessfully in the FERC proceeding], i. e., 9%. Thus, the disallowed costs bear no apparent relationship to the savings NOPSI is said to have foregone *[sic]*. Must not the 'savings' posited as the reason for the disallowance be at least possible in an actual economic market? Furthermore, must not the ultimate disallowance bear some rational relationship to the possible savings which support that disallowance? These questions must be resolved on another day in another court." App. to Pet. for Cert. 30A-31A, and n. 11.

3 ⊤    NOPSI's **state** suit has since been consolidated with a declaratory **judgment** action filed earlier by the Council, seeking a declaration that the rate order represented a just and reasonable exercise of regulatory power and that NOPSI's failure to comply with the order would be unlawful, and with a suit filed by a local consumers' rights organization, the Alliance for Affordable Energy, seeking to force the Council to disallow all or at least a larger proportion of the Grand Gulf costs. That case is still pending. *NOPSI* v. *Council of New Orleans*, No. 88-4511; *Boissiere* v. *Cain*, No. 88-2503; and *Alliance for Affordable Energy, Inc.* v. *Council of New Orleans*, No. 88-2502 (Civ. Dist. Ct., Parish of Orleans, La.).

4 ⊤    In *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U.S. 619 (1986), we held that the *Younger* doctrine prevented an injunction against an *ongoing* sex discrimination proceeding before the Ohio Civil Rights Commission. The only other decision of ours arguably applying *Younger* to an administrative proceeding, *Middlesex County Ethics Comm.* v. *Garden State Bar Assn.*, 457 U.S. 423 (1982), similarly involved a situation in which the proceeding was not yet at an end. The fact that *Dayton Christian Schools* relied, as an alternative argument, upon the fact that the **federal** challenge could be made upon appeal to the **state** courts, see 477 U.S., at 629, suggests, perhaps, that an administrative proceeding to which *Younger* applies cannot be challenged in **federal** court even after the administrative action has become final. But we have never squarely faced the question.

long

**Content Type:** Cases

**Terms:** federal abstention state judgment

**Narrow By:** Sources: All Illinois Federal & State Cases, Combined

**Date and Time:** May 17, 2022  02:34:37 p.m. EDT

LexisNexis®

Privacy Policy

Terms & Conditions

Copyright © 2022 LexisNexis.

RELX™

Print

Document: Sprint Communs., Inc. v. Jacobs, 571 U.S. 69

## ▲ Sprint Communs., Inc. v. Jacobs, 571 U.S. 69

Supreme Court of the United States

November 5, 2013, Argued; December 10, 2013, Decided

No. 12-815

**Reporter**

**571 U.S. 69** * | 134 S. Ct. 584 ** | 187 L. Ed. 2d 505 *** | 2013 U.S. LEXIS 9019 **** | 82 U.S.L.W. 4027 | 24 Fla. L. Weekly Fed. S 488 | 59 Comm. Reg. (P & F) 773 | 2013 WL 6410850

SPRINT COMMUNICATIONS, INC., Petitioner v. ELIZABETH S. JACOBS et al.

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [****1] ON WRIT OF CERTIORARI TO THE UNITED **STATES** COURT OF APPEALS FOR THE EIGHTH CIRCUIT
Sprint Communs. Co., L.P. v. Jacobs, 690 F.3d 864, 2012 U.S. App. LEXIS 18560 (8th Cir. Iowa, 2012)

**Disposition:** Reversed.

## Core Terms

proceedings, **federal** court, **abstention**, criminal prosecution, **federal**-court, court of appeals, circumstances, **state**-court, cases, important **state** interest, civil enforcement,

**state**-initiated, implicates, intrastate, initiated, akin

## Case Summary

**Procedural Posture**

Petitioner telecommunications service provider sued respondent utilities board members, seeking a declaration that the Telecommunications Act preempted the board's decision that intrastate fees applied to Internet long distance service. The lower courts abstained in deference to a parallel **state**-court proceeding between the provider and a local telecommunications carrier. Certiorari was granted as to whether Younger **abstention** was appropriate.

**Overview**

The scope of Younger **abstention** was limited to only three exceptional circumstances: (1) **federal** intrusion in ongoing **state** criminal prosecutions, (2) certain civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the **state** courts' ability to perform their judicial functions. Assuming that the board's administrative adjudication and subsequent **state** court review counted as a unitary process for Younger purposes, the initial board proceeding did not fall within any of the three exceptional categories, and thus, did not trigger Younger **abstention**. Specifically, the proceeding was not akin to a criminal prosecution, was not initiated by the **state** in its sovereign capacity, and no **state** authority conducted an investigation into the provider's activities or lodged a formal complaint against the provider. In essence, the board's adjudicative authority was invoked to settle a civil dispute between two private parties.

**Outcome**

The **judgment** was reversed. Unanimous Decision.

▼   LexisNexis® Headnotes

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾ > **Abstention** ▾

*HN1*⬇ **Federal & State Interrelationships, Abstention**
In the main, **federal** courts are obliged to decide cases within the scope of **federal** jurisdiction. **Abstention** is not in order simply because a pending **state**-court proceeding involves the same subject matter. Judicial precedent recognizes, however, certain instances in which the prospect of undue interference with **state** proceedings counsels against **federal** relief. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote

Civil Procedure > Preliminary Considerations ▾ > **Fed**eral & **State** Interrelationships ▾ > **Abstention** ▾

*HN2*⬇ **Federal & State Interrelationships, Abstention**
Younger **abstention** exemplifies one class of cases in which **federal**-court **abstention** is required: When there is a parallel, pending **state** criminal proceeding, **federal** courts must refrain from enjoining the **state** prosecution. Judicial precedent extends Younger **abstention** to particular **state** civil proceedings that are akin to criminal prosecutions or that implicate a **state**'s interest in enforcing the orders and **judgments** of its courts Case law cautions, however, that **federal** courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the **states**. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾ > **Abstention** ▾

*HN3*⬇ **Federal & State Interrelationships, Abstention**
Circumstances fitting within the Younger doctrine, judicial precedent stresses, are exceptional; they include **state** criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the **state** courts' ability to perform their judicial functions. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote

Civil Procedure > Preliminary Considerations ▾ > **Federal & State** Interrelationships ▾ > **Abstention** ▾

*HN4*⬇ **Federal & State Interrelationships, Abstention**
The general rule is that the pendency of an action in a **state** court is no bar to proceedings concerning the same matter in the **federal** court having jurisdiction. 🔍 More like this Headnote

*Shepardize®* - Narrow by this Headnote

Civil Procedure > Preliminary Considerations ▾ > Federal & State Interrelationships ▾

> Abstention ▾

HN5 Federal & State Interrelationships, Abstention
Federal courts have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. Jurisdiction existing, judicial precedent cautions, a federal court's obligation to hear and decide a case is virtually unflagging. Parallel state-court proceedings do not detract from that obligation. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote*

Civil Procedure > Preliminary Considerations ▾ > Federal & State Interrelationships ▾

> Abstention ▾

HN6 Federal & State Interrelationships, Abstention
Only exceptional circumstances justify a federal court's refusal to decide a case in deference to the states. Those exceptional circumstances exist in three types of proceedings. First, Younger abstention precludes federal intrusion into ongoing state criminal prosecutions. Second, certain civil enforcement proceedings warrant abstention. Finally, federal courts refrain from interfering with pending civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions. Younger abstention has not been applied outside these three exceptional categories, and judicial precedent now holds that they define the Younger abstention doctrine's scope. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote*

Civil Procedure > Preliminary Considerations ▾ > Federal & State Interrelationships ▾

> Abstention ▾

HN7 Federal & State Interrelationships, Abstention
Judicial decisions applying Younger abstention to instances of civil enforcement generally concern state proceedings akin to a criminal prosecution in important respects. Such enforcement actions are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act. In cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges. 🔍 More like this Headnote

*Shepardize® - Narrow by this Headnote*

▼ Lawyers' Edition Display

### Decision

[***505]  **Abstention** by **Federal** District Court from enjoining enforcement of **state** utility board's order held inappropriate, as **abstention** was not in order simply because pending **state**-court proceeding involved same subject matter as **federal** proceeding.

### Summary

**Procedural posture:** Petitioner telecommunications service provider sued respondent utilities board members, seeking a declaration that the Telecommunications Act pre-empted the board's decision that intrastate fees applied to Internet long distance service. The lower courts abstained in deference to a parallel **state**-court proceeding between the provider and a local telecommunications carrier. Certiorari was granted as to whether Younger **abstention** was appropriate.

**Overview:** The scope of Younger **abstention** was limited to only three exceptional circumstances: (1) **federal** intrusion in ongoing **state** criminal prosecutions, (2) certain civil enforcement proceedings, and (3) civil proceedings involving certain orders uniquely in furtherance of the **state** courts' ability to perform their judicial functions. Assuming that the board's administrative adjudication and subsequent **state** court review counted as a unitary process for Younger purposes, the initial board proceeding did not fall within any of the three exceptional categories, and thus, did not trigger Younger **abstention**. Specifically, the proceeding was not akin to a criminal prosecution, was not initiated by the **state** in its sovereign capacity, and no **state** authority conducted an investigation into the provider's activities or lodged a formal complaint against the provider. In essence, the board's adjudicative authority was invoked to settle a civil dispute between two private parties.

**Outcome:** The **judgment** was reversed. Unanimous Decision.

### Headnotes

[***506] COURTS §683 COURTS §757 > **FEDERAL** JURISDICTION -- **ABSTENTION** --

**STATE** PROCEEDINGS  > Headnote:

*LEdHN[1]* [1]

In the main, **federal** courts are obliged to decide cases within the scope of **federal** jurisdiction. **Abstention** is not in order simply because a pending **state**-court proceeding involves the same subject matter. Judicial precedent recognizes, however, certain instances in which the prospect of undue interference with **state** proceedings counsels against **federal** relief.

COURTS §698 COURTS §757 > **FEDERAL ABSTENTION** -- INTERFERENCE WITH

**STATE** PROCEEDING  > Headnote:

*LEdHN[2]* [2]

Younger **abstention** exemplifies one class of cases in which **federal**-court **abstention** is required: When there is a parallel, pending **state** criminal proceeding, **federal** courts must refrain from enjoining the **state** prosecution. Judicial precedent extends Younger **abstention** to particular **state** civil proceedings that are akin to criminal prosecutions or that implicate a **state**'s interest in enforcing the orders and **judgment**s of its courts. Case law cautions, however, that **federal** courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the **states**.

COURTS §683 > **FEDERAL ABSTENTION** -- INTERFERENCE WITH **STATE** COURTS

> Headnote:

*LEdHN[3]* [3]

Circumstances fitting within the Younger doctrine, judicial precedent stresses, are exceptional; they include **state** criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the **state** courts' ability to perform their judicial functions.

COURTS §709 > CONCURRENT JURISDICTION -- **STATE** AND **FEDERAL** COURTS

> Headnote:

*LEdHN[4]* [4]

The general rule is that the pendency of an action in a **state** court is no bar to proceedings concerning the same matter in the **federal** court having jurisdiction.

COURTS §230 COURTS §709 > **FEDERAL** JURISDICTION -- PARALLEL **STATE** PROCEEDINGS > Headnote:

*LEdHN[5]* [5]

**Federal** courts have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. Jurisdiction existing, judicial precedent cautions, a **federal** court's obligation to hear and decide a case is virtually unflagging. Parallel **state**-court proceedings do not detract from that obligation.

COURTS §683 > **FEDERAL ABSTENTION** -- INTERFERENCE WITH **STATE** COURTS

> Headnote:

*LEdHN[6]* [6]

Only exceptional circumstances justify a **federal** court's refusal to decide a case in deference to the **states**. Those exceptional circumstances exist in three types of proceedings. First, Younger **abstention** precludes **federal** intrusion into ongoing **state**

criminal prosecutions. Second, certain civil enforcement proceedings warrant **abstention**. Finally, **federal** courts refrain from interfering with pending civil proceedings involving certain orders uniquely in furtherance of the **state** courts' ability to perform their judicial functions. Younger **abstention** has not been applied outside these three exceptional categories, and judicial precedent now holds that they define the Younger **abstention** doctrine's scope.

[***507] COURTS §683 > **FEDERAL ABSTENTION** -- INTERFERENCE WITH **STATE** PROCEEDING > Headnote:

*LEdHN[7]* [7]

Judicial decisions applying Younger **abstention** to instances of civil enforcement generally concern **state** proceedings akin to a criminal prosecution in important respects. Such enforcement actions are characteristically initiated to sanction the **federal** plaintiff, i.e., the party challenging the **state** action, for some wrongful act. In cases of this genre, a **state** actor is routinely a party to the **state** proceeding and often initiates the action. Investigations are commonly involved, often culminating in the filing of a formal complaint or charges.

## Syllabus

[**585] **[*69]** Sprint Communications, Inc. (Sprint), a national telecommunications service provider, [**586] withheld payment of intercarrier access fees imposed by Windstream Iowa Communications, Inc. (Windstream), a local telecommunications carrier, for long distance Voice over Internet Protocol (VoIP) calls, after concluding that the Telecommunications Act of 1996 preempted intrastate regulation of VoIP traffic. Windstream responded by threatening to block all Sprint customer calls, which led Sprint to ask the Iowa Utilities Board (IUB) to enjoin Windstream from discontinuing service to Sprint. Windstream retracted its threat, and Sprint moved to withdraw its complaint. Concerned that the dispute would recur, the IUB continued the proceedings in order to resolve the question whether VoIP calls are subject to intrastate regulation. Rejecting Sprint's argument that [***508] this question was governed by **federal** law, the IUB ruled that intrastate fees applied to VoIP calls.

Sprint sued respondents, IUB members (collectively IUB), in **Federal** District Court, seeking a declaration that the Telecommunications Act of 1996 [****2] preempted the IUB's decision. As relief, Sprint sought an injunction against enforcement of the IUB's order. Sprint also sought review of the IUB's order in Iowa **state** court, reiterating the preemption argument made in Sprint's **federal**-court complaint and asserting several other claims. Invoking *Younger* v. *Harris,* 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669, the **Federal** District Court abstained from adjudicating Sprint's complaint in deference to the parallel **state**-court proceeding. The Eighth Circuit affirmed the District Court's **abstention** decision, concluding that *Younger* **abstention** was required because the ongoing **state**-court review concerned Iowa's important interest in regulating and enforcing **state** utility rates.

*Held:* This case does not fall within any of the three classes of exceptional cases for which *Younger* **abstention** is appropriate. Pp. 76-82, 187 L. Ed. 2d, at 512-516.

(a) The District Court had jurisdiction to decide whether **federal** law preempted the IUB's decision, see *Verizon Md. Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 642, 122 S. Ct. 1753, 152 L. Ed. 2d 871, and thus had a "virtually unflagging obligation" to hear and decide the case, *Colorado River Water Conservation Dist.* v. *United States,* 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483. In *Younger,* this Court recognized [****3] an exception to that obligation for cases in which there is a **[*70]** parallel, pending **state** criminal proceeding. This Court has extended *Younger* **abstention** to particular **state** civil proceedings that are

akin to criminal prosecutions, see *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592, 95 S. Ct. 1200, 43 L. Ed. 2d 482, or that implicate a **State**'s interest in enforcing the orders and **judgments** of its courts, see *Pennzoil Co.* v. *Texaco Inc.*, 481 U.S. 1, 107 S. Ct. 1519, 95 L. Ed. 2d 1, but has reaffirmed that "only exceptional circumstances justify a **federal** court's refusal to decide a case in deference to the **States**," *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U.S. 350, 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (*NOPSI*). *NOPSI* identified three such "exceptional circumstances." First, *Younger* precludes **federal** intrusion into ongoing **state** criminal prosecutions. See 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. Second, certain "civil enforcement proceedings" warrant *Younger* **abstention**. 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. Finally, **federal** courts should refrain from interfering with pending "civil proceedings involving certain orders . . . uniquely in furtherance of the **state** courts' ability to perform their judicial functions." *Ibid.* This Court has not [**587] applied *Younger* outside these three "exceptional" categories, and rules, in accord [****4] with *NOPSI*, that they define *Younger*'s scope. Pp. 76-78, 187 L. Ed. 2d, at 512-514.

(b) The initial IUB proceeding does not fall within any of *NOPSI*'s three exceptional categories and therefore does not trigger *Younger* **abstention**. The first and third categories plainly do not accommodate the IUB's proceeding, which was civil, not criminal, in character, and which did not touch on a **state** court's ability to perform its judicial function. Nor is the IUB's order an act of civil enforcement of the [***509] kind to which *Younger* has been extended. The IUB proceeding is not "akin to a criminal prosecution." *Huffman*, 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482. Nor was it initiated by "the **State** in its sovereign capacity," *Trainor* v. *Hernandez*, 431 U.S. 434, 444, 97 S. Ct. 1911, 52 L. Ed. 2d 486, to sanction Sprint for some wrongful act, see, *e.g.*, *Middlesex County Ethics Comm.* v. *Garden State Bar Ass'n*, 457 U.S. 423, 433-434, 102 S. Ct. 2515, 73 L. Ed. 2d 116. Rather, the action was initiated by Sprint, a private corporation. No **state** authority conducted an investigation into Sprint's activities or lodged a formal complaint against Sprint.

Once Sprint withdrew the complaint that commenced administrative proceedings, the IUB argues, those proceedings became, essentially, a civil enforcement action. However, the IUB's [****5] adjudicative authority was invoked to settle a civil dispute between two private parties, not to sanction Sprint for a wrongful act.

In holding that **abstention** was the proper course, the Eighth Circuit misinterpreted this Court's decision in *Middlesex* to mean that *Younger* **abstention** is warranted whenever there is (1) "an ongoing **state** judicial proceeding, which (2) implicates important **state** interests, and (3) . . . provide[s] an adequate opportunity to raise [**federal**] challenges." In *Middlesex*, the Court invoked *Younger* to bar a **federal [*71]** court from entertaining a lawyer's challenge to a **state** ethics committee's pending investigation of the lawyer. Unlike the IUB's proceeding, however, the **state** ethics committee's hearing in *Middlesex* was plainly "akin to a criminal proceeding": An investigation and formal complaint preceded the hearing, an agency of the **State**'s Supreme Court initiated the hearing, and the hearing's purpose was to determine whether the lawyer should be disciplined for failing to meet the **State**'s professional conduct standards. 457 U.S., at 433-435, 102 S. Ct. 2515, 73 L. Ed. 2d 116. The three Middlesex conditions invoked by the Court of Appeals were therefore not dispositive; they were, instead, *additional* [****6] factors appropriately considered by the **federal** court before invoking *Younger*. *Younger* extends to the three "exceptional circumstances" identified in *NOPSI*, but no further. Pp. 78-82, 187 L. Ed. 2d, at 514-516.

690 F. 3d 864, reversed.

**Counsel:** Timothy J. Simeone argued the cause for petitioner.


David J. Lynch argued the cause for respondents.


**Judges:** Ginsburg, J., delivered the opinion for a unanimous Court.

**Opinion by:** Ginsburg

## Opinion

[**588] [*72] JUSTICE **Ginsburg** delivered the opinion of the Court.

This case involves two proceedings, one pending in **state** court, the other in **federal** court. Each seeks review of an Iowa Utilities Board (IUB or Board) order. And each presents the question whether Windstream Iowa Communications, Inc. (Windstream), a local telecommunications carrier, may impose on Sprint Communications, Inc. (Sprint), intrastate access charges for telephone calls transported via the Internet. **Federal**-court jurisdiction over controversies of this kind was confirmed in *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002). Invoking *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), the U.S. District Court for the Southern District of [***510] Iowa abstained from adjudicating Sprint's complaint in deference to the parallel **state**-court proceeding, and the Court of Appeals for the Eighth Circuit affirmed the District Court's **abstention** decision.

We reverse [****7] the **judgment** of the Court of Appeals. *HN1 LEdHN[1]* [1] In the main, **federal** courts are obliged to decide cases within the scope of **federal** jurisdiction. **Abstention** is not in order simply because a pending **state**-court proceeding involves the same subject matter. *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989) (*NOPSI*) ("[T]here is no doctrine that . . . pendency of **state** judicial proceedings excludes the **federal** courts."). This Court has recognized, however, certain instances in which the prospect of undue interference with **state** proceedings counsels against **federal** relief. See *id.,* at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298.

*HN2 LEdHN[2]* [2] *Younger* exemplifies one class of cases in which **federal**-court **abstention** is required: When there is a parallel, pending **state** criminal proceeding, **federal** courts must refrain from enjoining the **state** prosecution. This Court has extended *Younger* **abstention** to particular **state** civil proceedings that are akin to criminal prosecutions, see *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975), or that implicate a **State**'s [*73] interest in enforcing the orders and **judgments** of its courts, see *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S. Ct. 1519, 95 L. Ed. 2d 1 (1987). We have cautioned, however, that **federal** courts [****8] ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not "refus[e] to decide a case in deference to the **States**." *NOPSI*, 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298.

*HN3 LEdHN[3]* [3] Circumstances fitting within the *Younger* doctrine, we have stressed, are "exceptional"; they include, as catalogued in *NOPSI*, "**state** criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the **state** courts' ability to perform their judicial functions." *Id.,* at 367-368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. Because this case presents none of the circumstances the Court has ranked as "exceptional," the general rule governs: *HN4 LEdHN[4]* [4] "[T]he pendency of an action in [a] **state** court is no bar to proceedings concerning the same matter in the **Federal** court having jurisdiction." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976) (quoting *McClellan v. Carland*, 217 U.S. 268, 282, 30 S. Ct. 501, 54 L. Ed. 762 (1910)).

I

Sprint, a **national** telecommunications service provider, has long paid intercarrier access fees to the Iowa communications company Windstream (formerly Iowa Telecom) for certain long distance calls placed [**589] by Sprint customers to Windstream's [****9] in-**state**

customers. In 2009, however, Sprint decided to withhold payment for a subset of those calls, classified as Voice over Internet Protocol (VoIP), after concluding that the Telecommunications Act of 1996 preempted intrastate regulation of VoIP traffic. 1⬇ In [***511] response, Windstream threatened to block all calls to and from Sprint customers.

[*74] Sprint filed a complaint against Windstream with the IUB asking the Board to enjoin Windstream from discontinuing service to Sprint. In Sprint's view, Iowa law entitled it to withhold payment while it contested the access charges and prohibited Windstream from carrying out its disconnection threat. In answer to Sprint's complaint, Windstream retracted its threat to discontinue serving Sprint, and Sprint moved, successfully, to withdraw its complaint. Because the conflict between Sprint and Windstream over VoIP [****10] calls was "likely to recur," however, the IUB decided to continue the proceedings to resolve the underlying legal question, *i.e.,* whether VoIP calls are subject to intrastate regulation. Order in *Sprint Communications Co.* v. *Iowa Telecommunications Servs., Inc.*, No. FCU-2010-0001 (IUB, Feb. 1, 2010), p. 6 (IUB Order). The question retained by the IUB, Sprint argued, was governed by **federal** law, and was not within the IUB's adjudicative jurisdiction. The IUB disagreed, ruling that the intrastate fees applied to VoIP calls. 2⬇

Seeking to overturn the Board's ruling, Sprint commenced two lawsuits. First, Sprint sued the members of the IUB (respondents here) 3⬇ in their official capacities in the United **States** District Court for the Southern District of Iowa. In its **federal**-court complaint, Sprint sought a declaration that the Telecommunications Act of 1996 preempted the IUB's decision; as relief, Sprint requested an injunction against enforcement of the IUB's order. Second, Sprint petitioned for review of the IUB's order in Iowa **state** court. The **state** petition reiterated the preemption argument Sprint made [****11] in its **federal**-court complaint; in addition, Sprint asserted **state** law and procedural due process claims. Because Eighth Circuit precedent effectively required a plaintiff to exhaust **state** remedies before proceeding to **federal** court, see *Alleghany Corp.* v. *McCartney*, 896 F. 2d 1138 (1990), Sprint [*75] urges that it filed the **state** suit as a protective measure. Failing to do so, Sprint explains, risked losing the opportunity to obtain any review, **federal** or **state**, should the **federal** court decide to abstain after the expiration of the Iowa statute of limitations. See Brief for Petitioner 7-8. 4⬇

[**590] As [****12] Sprint anticipated, the IUB filed a motion asking the **Federal** District Court to abstain in light of the **state** suit, citing *Younger* v. *Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). The District Court granted the IUB's motion and dismissed the suit. The IUB's decision, and the pending **state**-court review of it, the District Court said, composed one "uninterruptible [***512] process" implicating important **state** interests. On that ground, the court ruled, *Younger* **abstention** was in order. *Sprint Communications Co.* v. *Berntsen*, No. 4:11-cv-00183-JAJ (SD Iowa, Aug. 1, 2011), App. to Pet. for Cert. 24a.

For the most part, the Eighth Circuit agreed with the District Court's **judgment**. The Court of Appeals rejected the argument, accepted by several of its sister courts, that *Younger* **abstention** is appropriate only when the parallel **state** proceedings are "coercive," rather than "remedial," in nature. 690 F. 3d 864, 868 (2012); cf. *Guillemard-Ginorio* v. *Contreras-Gomez*, 585 F. 3d 508, 522 (CA1 2009) ("[P]roceedings must be coercive, and in most cases, **state**-initiated, in order to warrant **abstention**."). Instead, the Eighth Circuit read this Court's precedent to require *Younger* **abstention** whenever "an ongoing **state** judicial [****13] proceeding . . . implicates important **state** interests, and . . . the **state** proceedings provide adequate opportunity to raise [**federal**] challenges." [*76] 690 F. 3d, at 867 (citing *Middlesex County Ethics Comm.* v. *Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982)). Those criteria were satisfied here, the appeals court held, because the ongoing **state**-court review of the IUB's decision concerned Iowa's "important **state** interest in regulating and enforcing its intrastate utility rates." 690 F. 3d, at 868. Recognizing the "possibility that the parties [might] return to **federal** court," however, the Court of Appeals vacated the **judgment** dismissing Sprint's complaint. In lieu of dismissal, the Eighth Circuit remanded the case, instructing the District Court to enter a stay during the pendency of the **state**-court action. *Id.,* at 869.

We granted certiorari to decide whether, consistent with our delineation of cases encompassed by the *cYounger* doctrine, **abstention** was appropriate here. 569 U.S. 917, 133 S. Ct. 1805, 185 L. Ed. 2d 810 (2013). 5⬇

II

A

Neither party has questioned the District Court's jurisdiction to decide whether **federal** law preempted the IUB's decision, and rightly so. In *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S. Ct. 1753, 152 L. Ed. 2d 871 (2002), we reviewed a similar **federal**-court challenge to a **state** administrative adjudication. In that case, as here, the party seeking **federal**-court review of a **state** agency's decision urged that the Telecommunications Act of 1996 preempted the **state** action. We had "no doubt that **federal** courts ha[d **federal** question] jurisdiction under [28 U.S. C.] §1331 to entertain such a suit," *id.*, at 64, 122 S. Ct. 1753, 152 L. Ed. 2d 8712, and nothing in the Telecommunications Act detracted from that conclusion, see *id.*, at 643, 122 S. Ct. 1753, 152 L. Ed. 2d 871.

*HN5* *LEdHN[5]* [5] [**77**] **Federal** courts, it was early and famously said, have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." [**591**] *Cohens* v. *Virginia*, 19 U.S. 264, 6 Wheat. 264, 404, 5 L. Ed. 257 (1821). Jurisdiction existing, this [***513**] Court has cautioned, a **federal** court's "obligation" to hear and decide a case is "virtually unflagging." *Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976). [****15**] Parallel **state**-court proceedings do not detract from that obligation. See *ibid.*

In *Younger*, we recognized a "far-from-novel" exception to this general rule. *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U.S. 350, 364, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989) (*NOPSI*). The plaintiff in *Younger* sought **federal**-court adjudication of the constitutionality of the California Criminal Syndicalism Act. Requesting an injunction against the Act's enforcement, the **federal**-court plaintiff was at the time the defendant in a pending **state** criminal prosecution under the Act. In those circumstances, we said, the **federal** court should decline to enjoin the prosecution, absent bad faith, harassment, or a patently invalid **state** statute. See 401 U.S., at 53-54, 91 S. Ct. 746, 27 L. Ed. 2d 669. **Abstention** was in order, we explained, under "the basic doctrine of equity jurisprudence that courts of equity should not act . . . to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparably injury if denied equitable relief." *Id.*, at 43-44, 91 S. Ct. 746, 27 L. Ed. 2d 669. "[R]estraining equity jurisdiction within narrow limits," the Court observed, would "prevent erosion of the role of the jury and avoid a duplication of legal [****16**] proceedings and legal sanctions." *Id.*, at 44, 91 S. Ct. 746, 27 L. Ed. 2d 669. We explained as well that this doctrine was "reinforced" by the notion of "'comity,' that is, a proper respect for **state** functions." *Ibid.*

We have since applied *Younger* to bar **federal** relief in certain civil actions. *Huffman* v. *Pursue, Ltd.*, 420 U.S. 592, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975), is the pathmarking decision. There, Ohio officials brought a civil action in **state** court to abate the showing of obscene movies in Pursue's theater. Because the **State** was a party and the proceeding was "in aid of and closely related [**78**] to [the **State**'s] criminal statutes," the Court held *Younger* **abstention** appropriate. 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482.

More recently, in *NOPSI*, 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298, the Court had occasion to review and restate our *Younger* jurisprudence. *NOPSI* addressed and rejected an argument that a **federal** court should refuse to exercise jurisdiction to review a **state** council's ratemaking decision. *HN6* *LEdHN[6]* [6] "[O]nly exceptional circumstances," we reaffirmed, "justify a **federal** court's refusal to decide a case in deference to the **States**." 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. Those "exceptional circumstances" exist, the Court determined after surveying prior decisions, in three types of proceedings. First, *Younger* precluded **federal** [****17**] intrusion into ongoing **state** criminal prosecutions. See 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. Second, certain "civil enforcement proceedings" warranted **abstention**. *Ibid.* (citing, *e.g.*, *Huffman*, 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482). Finally, **federal** courts refrained from interfering with

pending "civil proceedings involving certain orders . . . uniquely in furtherance of the **state** courts' ability to perform their judicial functions." 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (citing *Juidice* v. *Vail*, 430 U.S. 327, 336, n. 12, 97 S. Ct. 1211, 51 L. Ed. 2d 376 (1977), and *Pennzoil Co.* v. *Texaco Inc.*, 481 U.S. 1, 13, 107 S. Ct. 1519, [***514] 95 L. Ed. 2d 1 (1987)). We have not applied *Younger* outside these three "exceptional" categories, and today hold, in accord with *NOPSI*, that they define *Younger*'s scope.

B

The IUB does not assert that the Iowa **state** court's review of the Board [**592] decision, considered alone, implicates *Younger*. Rather, the initial administrative proceeding justifies staying any action in **federal** court, the IUB contends, until the **state** review process has concluded. The same argument was advanced in *NOPSI*. 491 U.S., at 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298. We will assume without deciding, as the Court did in *NOPSI*, that an administrative adjudication and the subsequent **state** court's review of it count as a "unitary process" for *Younger* purposes. *Id.,* at 369, 109 S. Ct. 2506, 105 L. Ed. 2d 298. [****18] The question remains, however, whether the **[*79]** initial IUB proceeding is of the "sort . . . entitled to *Younger* treatment." *Ibid.*

The IUB proceeding, we conclude, does not fall within any of the three exceptional categories described in *NOPSI* and therefore does not trigger *Younger* **abstention**. The first and third categories plainly do not accommodate the IUB's proceeding. That proceeding was civil, not criminal, in character, and it did not touch on a **state** court's ability to perform its judicial function. Cf. *Juidice*, 430 U.S., at 336, n. 12, 97 S. Ct. 1211, 51 L. Ed. 2d 376 (civil contempt order); *Pennzoil*, 481 U.S., at 13, 107 S. Ct. 1519, 95 L. Ed. 2d 1 (requirement for posting bond pending appeal).

Nor does the IUB's order rank as an act of civil enforcement of the kind to which *Younger* has been extended. *HN7* *LEdHN[7]* [7] Our decisions applying *Younger* to instances of civil enforcement have generally concerned **state** proceedings "akin to a criminal prosecution" in "important respects." *Huffman*, 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482. See also *Middlesex*, 457 U.S., at 432, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (*Younger* **abstention** appropriate where "noncriminal proceedings bear a close relationship to proceedings criminal in nature"). Such enforcement actions are characteristically initiated to sanction the **federal** plaintiff, *i.e.*, [****19] the party challenging the **state** action, for some wrongful act. See, *e.g., Middlesex*, 457 U.S., at 433-434, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (**state**-initiated disciplinary proceedings against lawyer for violation of **state** ethics rules). In cases of this genre, a **state** actor is routinely a party to the **state** proceeding and often initiates the action. See, *e.g., Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S. Ct. 2718, 91 L. Ed. 2d 512 (1986) (**state**-initiated administrative proceedings to enforce **state** civil rights laws); *Moore* v. *Sims*, 442 U.S. 415, 419-420, 99 S. Ct. 2371, 60 L. Ed. 2d 994 (1979) (**state**-initiated proceeding to gain custody of children allegedly abused by their parents); *Trainor* v. *Hernandez*, 431 U.S. 434, 444, 97 S. Ct. 1911, 52 L. Ed. 2d 486 (1977) (civil proceeding "brought by the **State** in its sovereign capacity" to recover welfare payments defendants had allegedly obtained by fraud); *Huffman*, 420 U.S., at 598, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (**state**-initiated proceeding to enforce obscenity laws). Investigations are commonly involved, **[*80]** often culminating in the filing of a formal complaint or charges. See, *e.g., Dayton*, 477 U.S., at 624, 106 S. Ct. 2718, 91 L. Ed. 2d 512 (noting preliminary investigation and complaint); *Middlesex* [***515] , 457 U.S., at 433, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (same).

The IUB proceeding does not resemble the **state** enforcement actions this Court [****20] has found appropriate for *Younger* **abstention**. It is not "akin to a criminal prosecution." *Huffman*, 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482. Nor was it initiated by "the **State** in its sovereign capacity." *Trainor*, 431 U.S., at 444, 97 S. Ct. 1911, 52 L. Ed. 2d 486. A private corporation, Sprint, initiated the action. No **state** authority conducted an investigation into Sprint's activities, and no **state** actor lodged a formal complaint against Sprint.

In its brief, the IUB emphasizes Sprint's decision to withdraw the complaint that commenced proceedings before the Board. At that point, the IUB argues, Sprint was [**593] no longer a willing participant, and the proceedings became, essentially, a civil enforcement action. See Brief for Respondents 31. 6⬇ The IUB's adjudicative authority, however, was invoked to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act. Although Sprint withdrew its complaint, administrative efficiency, not misconduct by Sprint, prompted the IUB to answer the underlying **federal** question. By determining the intercarrier compensation regime applicable to VoIP calls, the IUB sought to avoid renewed litigation of the parties' dispute. Because the underlying legal question remained [****21] unsettled, the Board observed, the controversy was "likely to recur." IUB Order 6. Nothing here suggests that the **[*81]** IUB proceeding was "more akin to a criminal prosecution than are most civil cases." *Huffman*, 420 U.S., at 604, 95 S. Ct. 1200, 43 L. Ed. 2d 482.

In holding that **abstention** was the proper course, the Eighth Circuit relied heavily on this Court's decision in *Middlesex*. *Younger* **abstention** was warranted, the Court of Appeals read *Middlesex* to say, whenever three conditions are met: There is (1) "an ongoing **state** judicial proceeding, which (2) implicates important **state** interests, and (3) . . . provide[s] an adequate opportunity to raise [**federal**] challenges." 690 F. 3d, at 867 [****22] (citing *Middlesex*, 457 U.S., at 432, 102 S. Ct. 2515, 73 L. Ed. 2d 116). Before this Court, the IUB has endorsed the Eighth Circuit's approach. Brief for Respondents 13.

The Court of Appeals and the IUB attribute to this Court's decision in *Middlesex* extraordinary breadth. We invoked *Younger* in *Middlesex* to bar a **federal** court from entertaining a lawyer's challenge to a New Jersey **state** ethics committee's pending investigation of the lawyer. Unlike the IUB proceeding here, the **state** ethics committee's hearing in *Middlesex* was indeed "akin to a criminal proceeding." As we noted, an investigation and formal complaint preceded the hearing, an agency of the **State**'s Supreme Court initiated the hearing, and the purpose of the hearing was to determine whether the lawyer should be disciplined for his failure to meet the [***516] **State**'s standards of professional conduct. 457 U.S., at 433-435, 102 S. Ct. 2515, 73 L. Ed. 2d 116. See also *id.*, at 438, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (Brennan, J., concurring in **judgment**) (noting the "quasi-criminal nature of bar disciplinary proceedings"). The three *Middlesex* conditions recited above were not dispositive; they were, instead, *additional* factors appropriately considered by the **federal** court before invoking *Younger*.

Divorced from their quasi-criminal context, [****23] the three *Middlesex* conditions would extend *Younger* to virtually all parallel **state** and **federal** proceedings, at least where a party could identify a plausibly important **state** interest. See Tr. of Oral Arg. 35-36. That result is irreconcilable with our dominant instruction that, even in the presence of parallel **[*82]** **state** proceedings, **abstention** from the exercise of **federal** jurisdiction is the "exception, not the rule." *Hawaii Housing Authority* v. *Midkiff*, 467 U.S. 229, 236, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984) (quoting *Colorado River*, 424 U.S., at 813, 96 S. Ct. 1236, 47 L. Ed. 2d 483). In short, to guide other **federal** courts, we today clarify [**594] and affirm that *Younger* extends to the three "exceptional circumstances" identified in *NOPSI*, but no further.

* * *

For the reasons **stated**, the **judgment** of the United **States** Court of Appeals for the Eighth Circuit is

*Reversed.*

## References

17A Moore's **Federal** Practice § 122.05 (Matthew Bender 3d ed.)

L Ed Digest, Courts §§683, 696

L Ed Index, **Abstention** Doctrine

Supreme Court's views as to application to noncriminal proceedings of rule against **federal** judicial intervention in pending or threatened **state** proceedings. 73 L. Ed. 2d 1416.

Supreme Court's definition and application of doctrine of "**abstention**" where questions of **state** law are controlling in **federal** civil case. 58 L. Ed. 2d 862.

Supreme Court's rule, and exceptions to rule, against **federal** judicial intervention in pending or threatened [****24] **state** criminal proceedings. 44 L. Ed. 2d 692.

---

**Footnotes**

1⏚     The **Federal** Communications Commission has yet to provide its view on whether the Telecommunications Act categorically preempts intrastate access charges for VoIP calls. See *In re Connect America Fund*, 26 FCC Rcd. 17663, 18002, ¶934 (2011) (reserving the question whether all VoIP calls "must be subject exclusively to **federal** regulation").

2⏚     At the conclusion of the IUB proceedings, Sprint paid Windstream all contested fees.

3⏚     For convenience, we refer to respondents collectively as the IUB.

4⏚     Since we granted certiorari, the Iowa **state** court issued an opinion rejecting Sprint's preemption claim on the merits. *Sprint Communications Co.* v. *Iowa Utils. Bd.*, No. CV-8638, App. to Joint Supp. Brief 20a-36a (Iowa Dist. Ct., Sept. 16, 2013).

The Iowa court decision does not, in the parties' view, moot this case, see Joint Supp. Brief 1, and we agree. Because Sprint intends to appeal the **state**-court decision, the "controversy . . . remains live." *Exxon Mobil Corp.* v. *Saudi Basic Industries Corp.*, 544 U.S. 280, 291, n. 7, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005).

**5** ⚓

The IUB agrees with Sprint that our decision in *Burford* v. *Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943), cannot independently sustain the Eighth Circuit's **abstention** analysis. See Brief for Respondents 9; cf.  [****14] *New Orleans Public Service, Inc.* v. *Council of City of New Orleans*, 491 U.S. 350, 359, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989).

**6** ⚓

To determine whether a **state** proceeding is an enforcement action under *Younger*, several Courts of Appeals, as noted, see *supra,* at 75, 187 L. Ed. 2d, at 512, inquire whether the underlying **state** proceeding is "coercive" rather than "remedial." See, *e.g., Devlin* v. *Kalm*, 594 F. 3d 893, 895 (CA6 2010). Though we referenced this dichotomy once in a footnote, see *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U.S. 619, 627, n. 2, 106 S. Ct. 2718, 91 L. Ed. 2d 512 (1986), we do not find the inquiry necessary or inevitably helpful, given the susceptibility of the designations to manipulation.

**Content Type:** Cases

**Terms:** federal abstention state judgment

**Narrow By:** Sources: All Illinois Federal & State Cases, Combined

**Date and Time:** May 17, 2022  02:30:21 p.m. EDT

 LexisNexis®   Privacy Policy   Terms & Conditions   Copyright © 2022 LexisNexis.   RELX™   Print